RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DUZUAN LESTER,

*Plaintiff-Appellant*,

*v.*

KEITH ROBERTS, Detective, in his individual capacity;
LOUISVILLE METRO GOVERNMENT,

*Defendants-Appellees*.

No. 20-5011

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:16-cv-00119—Gregory N. Stivers, District Judge.

Argued: October 21, 2020

Decided and Filed: January 20, 2021

Before: BATCHELDER, GRIFFIN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** David N. Ward, ADAMS LANDENWICH & WALTON, Louisville, Kentucky, for
Appellant. J. Denis Ogburn, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville,
Kentucky, for Appellees. **ON BRIEF:** David N. Ward, ADAMS LANDENWICH &
WALTON, Louisville, Kentucky, for Appellant. J. Denis Ogburn, JEFFERSON COUNTY
ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellees.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge. The demands on government increase the more it intrudes into
its people's liberty. The government, for example, must meet a lower standard to indict and

detain criminal defendants before trial (probable cause) than the standard it must meet to convict and imprison them after trial (proof beyond a reasonable doubt). *See Draper v. United States*, 358 U.S. 307, 311–12 (1959). Likewise, the government may use hearsay to establish probable cause, but must permit defendants to confront the witnesses against them at trial. *See id.*; U.S. Const. amend. VI. To protect defendants before trial, therefore, the Framers added other procedural safeguards, including the right to a speedy trial and against excessive bail. U.S. Const. amend. VI, VIII. Nevertheless, given the reduced burdens imposed on the government at this pretrial stage, the Supreme Court has recognized that cases will inevitably arise in which the government validly establishes the probable cause necessary for a pretrial detention, but later falls short in proving guilt beyond a reasonable doubt. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

This is one of those cases. A witness told Detective Keith Roberts that her former boyfriend, Eugene Baker, and one of Baker's friends whom she knew as "Desean" had robbed and murdered a competing drug dealer. After this witness identified a photo of the plaintiff, Duzuan Lester, as the "Desean" who had accompanied Baker to the murder, Kentucky prosecutors indicted Baker and Lester. When confronted face-to-face with Lester at trial, however, the witness suggested that Lester did not look like Baker's accomplice. Finding that the prosecution had not proven its case beyond a reasonable doubt, the jury acquitted Lester. He now claims that Detective Roberts violated the Fourth Amendment and Kentucky tort law by inadequately investigating the murder before helping initiate the criminal case. Yet the Fourth Amendment and Kentucky law required only probable cause for Lester's pretrial detention and prosecution. And this witness's earlier identification of Lester—combined with corroborating evidence like DNA at the scene—sufficed to meet that standard. We thus affirm the grant of summary judgment to Roberts.

I

A

Around 7:00 p.m. on August 25, 2007, Dominic Hudson was shot and killed in his Louisville apartment. Detective Roberts, who worked for the police department's homicide unit,

arrived at the scene 40 minutes later. He interviewed the woman who had called 911 along with her boyfriend. The woman told Roberts that she had called Hudson between 6:30 and 7:00 p.m. about picking up CDs. When she and her boyfriend arrived at Hudson's apartment, the door was not fully shut. Hudson also did not come to the door or answer his phone. They entered, saw his body on the kitchen floor, and ran out to call 911.

Another detective walked to a nearby BP gas station to interview Charles Evans. Evans explained that around 7:00 p.m. he saw two men "run from around the west side of his building and continue running past the west side of the apartment office and east bound towards" the street with the BP. Evans believed that one of the men was a person he knew as "Ray Ray." He described Ray Ray as an African American in his "early 20s" with a "thin build." Evans recalled that this man "had to keep stopping while he was running because he lost his shoe." He described the other man as an African American in his "mid 20s" with a "muscular build." This suspect was "wearing blue jean shorts and no shirt."

The next day, Kristie Hart called the police because she had been at Hudson's apartment right before the murder. Roberts interviewed her weeks later. Hart stated that Hudson had been her friend and had regularly sold marijuana from his apartment. She visited his apartment around 6:20 p.m. and planned to go out with Hudson and her cousin, Teresa Wise. Two young African-American men stopped by shortly before Wise arrived. Hudson began to argue with one of them about money. So Hart and Wise opted to leave around 6:50. Hart described the man arguing with Hudson as chubby and wearing a black t-shirt and dark shorts. She described the second man as thin and wearing a t-shirt with plaid shorts. Both men wore ball caps, but one of them placed his hat on a desk. (A hat was recovered from the scene.)

Detective Roberts interviewed Wise a week later. Wise confirmed that she had left the apartment at about 6:50 p.m. Yet she said she barely saw the men. When she left, one was sitting in a computer chair. She recalled him having a "stocky" build and a brown t-shirt. The other was standing against the wall and wearing a red hat. Wise could not make a positive identification from a photo array but suggested that a picture of "William Charter" resembled one of the men.

At some point, Detective Roberts identified the "Ray Ray" that Evans thought had been fleeing from the scene as the "William Charter" who Wise said resembled one of the men in the apartment. But Roberts concluded that Charter had not been involved after interviewing him and finding him "forthcoming."

In October 2007, the investigation instead turned to Eugene Baker and Duzuan Lester (the plaintiff) when Roberts interviewed Susan Copass-Cheng. Copass-Cheng had been Baker's girlfriend for years but had ended the relationship because of his abuse. She told Roberts that a "distraught" Baker had called her days after the murder "in a panic" wanting to see her and their child. When Copass-Cheng visited Baker, he told her: "I just needed to see you because I did something that if somebody finds out, I will probably never be able to see you all again." He added: "If they catch me, I'm gonna go away for a long time."

In her interview with Roberts, Copass-Cheng implicated Lester as the second man when she described three separate conversations—one with a woman named "Jasmine" who was then living with Baker, the next with Baker's sister, and the third with a friend. After Copass-Cheng told Jasmine that she was scared, Jasmine responded that she need not worry about retaliation because Baker had "finished it." Jasmine also noted: "We haven't seen Dezuan since all that stuff happened" and "He's scared to death." Baker's sister told Copass-Cheng that she thought "they hit a lick on a guy named Dominique" and described "Dominique" as a person who sold Baker marijuana. (Copass-Cheng described "hitting a lick" as taking something "from somebody that they're not supposed to have anyway," such as "stolen property" or "illegal drugs.") Copass-Cheng then discussed with a friend what Jasmine and Baker's sister had told her. The friend said: "Jasmine just told you that [Baker] was with Dezuan whenever he did whatever he was supposed to do. [Baker's sister] just told you it was a guy named Dominique. That's way too much coincidental stuff." Copass-Cheng identified "Dezuan's" last name as "Lester" and said she knew him from high school. She also told Roberts that Baker and Lester were friends.

This interview led Detective Roberts to take various steps. He showed Hart (the victim's friend who had visited his apartment) a photo array that included Baker's picture. Hart identified Baker as one of the men at the apartment. Roberts also interviewed Baker and Lester. Baker

admitted to buying drugs from the victim, but quickly invoked his right to counsel. Lester asserted that he did not know the victim, had never been to his apartment, and had nothing to do with the murder. Lester admitted to being friends with Baker but claimed that he had not seen Baker for a year apart from "doing music together" and running into him on the street.

Detective Roberts sought DNA testing for items at the murder scene, including the hat. In May 2008, DNA on the hat came back "consistent with a mixture" from Lester, Baker, and an unknown person. An "estimated one person per 6.3 thousand could be a contributor to this mixture based on the relevant United States populations."

After gathering this evidence, Roberts shared his file with a prosecutor. Although the two believed that they had probable cause to indict Baker and Lester, they concluded that they lacked enough evidence to convict.

B

The case went cold for years. In November 2012, Detective Roberts developed a new lead. He interviewed Nikkia Sullivan, an inmate who had contacted the police years before about the murder. Sullivan had dated Hudson (the victim) and had been best friends with Jasmine (the woman living with Baker, whose last name Sullivan identified as "Williams"). She told Detective Roberts that Jasmine Williams (hereinafter "Williams") had told her months after the murder that she had been driving when Baker went to Hudson's apartment and killed him. According to Sullivan, Williams said "it was over money": Baker wanted his drug clientele back after they had switched to Hudson. Williams also said that another man had gone with Baker, but Williams was unable to tell Sullivan his name. Separately, Sullivan told Detective Roberts that she had repeatedly called Williams after the murder asking about Hudson's whereabouts. Baker at some point took the phone, told Sullivan "I killed him," and hung up.

Detective Roberts then interviewed Williams. Williams told him that, on the day of the murder, she was with Baker, her baby, and a man named "Desean" in a silver Impala belonging to "Desean's" girlfriend. Williams thought that they were going to Hudson's apartment to pick up a phone. They parked at the nearby BP, and the two men walked across the street to Hudson's apartment. But the men later came running back with "bandanas tied around their face[s]"

yelling "go—go—go!" Williams added that they had "weed and all this other shit," including money. "Desean" dropped Baker and Williams off at the home of Baker's cousin. There, Baker confessed that he murdered Hudson, telling Williams that he "shot him in the back of the head" and "when he fell he was . . . kinda shaking on the floor[.]" Williams thought that Baker murdered Hudson because he had become the area's main drug dealer.

Williams knew Baker better than "Desean." She could not recall "Desean's" last name and pronounced his first name differently from how Lester pronounces his name (spelled Duzuan and pronounced like the mustard). She had met "Desean" on only a few occasions when he came to her apartment to rap with Baker. She also never saw him after the murder. But she opined that Baker and "Desean" knew each other "very well" based on their interactions. When shown a photo array, she identified Lester's picture as the "Desean" who had accompanied Baker.

This time, the prosecution decided to indict Baker and Lester. In December 2012, Roberts testified before a grand jury that Baker and Lester "were developed as suspects" during his investigation. He indicated that the two traveled to Hudson's apartment, that Baker shot Hudson, and that they took cash and suspected marijuana. The grand jury indicted the pair on, among other charges, murder and robbery counts.

In early 2015, the prosecution tried Baker and Lester. At trial, Jasmine Williams distanced herself from her photo identification of Lester as the "Desean" who had accompanied Baker. She testified: "Honestly, um, that don't look like Duzuan." Although the court denied Lester's motion for judgment of acquittal, a prosecutor (who had not been involved before trial) made an unusual request during closing: that the jury *acquit* Lester. The jury acquitted Lester but did not reach a verdict for Baker. The prosecution retried Baker a year later. A second jury convicted Baker of murder, robbery, tampering with evidence, and being a felon in possession of a firearm.

C

Lester spent 20 months in jail and three months in home confinement on the criminal charges. After his acquittal, he sued Roberts and the Louisville Metro Government in state court.

The defendants removed the suit to federal court. A magistrate judge recommended that the district court grant them summary judgment. *Lester v. Roberts*, 2018 WL 8620745, at *11 (W.D. Ky. Dec. 11, 2018). The district court adopted this recommendation. *Lester v. Roberts*, 2019 WL 1421755, at *1–4 (W.D. Ky. Mar. 29, 2019). Lester now appeals the district court's summary-judgment decision as to his two malicious-prosecution claims against Detective Roberts under the Fourth Amendment and Kentucky tort law. We review the decision de novo. *See Pineda v. Hamilton County*, 977 F.3d 483, 489 (6th Cir. 2020).

II

A

Lester's federal malicious-prosecution claim alleges a violation of the Fourth Amendment under 42 U.S.C. § 1983. Yet neither the Constitution nor § 1983 uses the words "malicious prosecution." Perhaps unsurprisingly, then, our justification for this constitutional claim has evolved over time. We once suggested that defendants had a substantive-due-process right under the Fourteenth Amendment to be free from malicious prosecutions that "shock the conscience." *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990); *Cale v. Johnson*, 861 F.2d 943, 949–50 (6th Cir. 1988). But the Supreme Court rejected our view in *Albright v. Oliver*, 510 U.S. 266 (1994). A plurality explained that the "Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Id.* at 274 (plurality opinion). The plurality, however, opted to leave open the question whether a malicious-prosecution claim could be asserted under the Fourth Amendment. *Id.* at 275.

We have taken a winding path since *Albright*. Shortly after that decision, we continued to follow our previous malicious-prosecution framework under the Fourteenth Amendment simply by changing the "label" to the Fourth. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 & n.19 (6th Cir. 1999). We soon recognized a textual problem: The Fourth Amendment regulates seizures, so we held it does not "support a separate malicious prosecution claim independent of the underlying illegal seizure." *Frantz v. Village of Bradford*, 245 F.3d 869, 876 (6th Cir. 2001). But *Frantz*'s reading did not last long. We next held that *Frantz* conflicted with *Spurlock*, which "obliged" us to "recognize a separate constitutionally cognizable claim of malicious prosecution

under the Fourth Amendment." *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). Since then, we have acknowledged that our old framework (with its shocks-the-conscience test) does not fit the Fourth Amendment. We have thus changed the elements for a constitutional malicious-prosecution claim. *See Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). Today, we require proof that: (1) the defendant "made, influenced, or participated in the decision to prosecute"; (2) the government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor. *See Jones v. Clark County*, 959 F.3d 748, 756 (6th Cir. 2020).

Our current status quo looks no more stable. We have called the malicious-prosecution label an "unfortunate and confusing" "misnomer." *Sykes*, 625 F.3d at 310; *Howse v. Hodous*, 953 F.3d 402, 408–09 (6th Cir. 2020). Consider the text: The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures[.]" U.S. Const. amend. IV. It bars certain kinds of seizures, not prosecutions. *Tlapanco v. Elges*, 969 F.3d 638, 658–59 (6th Cir. 2020) (Thapar, J., concurring). And it establishes an objective reasonableness test, not a subjective maliciousness test. *Id.* Or consider precedent: The Supreme Court has never adopted a malicious-prosecution claim since *Albright*. To the contrary, it has avoided that name. *See Manuel v. City of Joliet*, 137 S. Ct. 911, 919–20 (2017). *Manuel* considered a claim that the police used false evidence to charge and detain the plaintiff before trial. *Id.* at 915. Highlighting the Fourth Amendment's text, the Court asked whether the police had caused an "unreasonable" "seizure" of the plaintiff. *Id.* at 917. And it noted that the pretrial detention qualifies as a "seizure." *Id.* at 919–20. Like our earlier decision in *Frantz*, therefore, *Manuel* suggests that we should focus on the *seizure* (Lester's two-year detention) rather than the *prosecution* (Lester's criminal proceedings).

Regardless, this distinction between a seizure and a prosecution does not matter here. Whether it should be called a "malicious-prosecution claim" or simply an "unreasonable-seizure claim," the claim has two universally applicable ground rules. As a matter of substance, the Fourth Amendment prohibits only those pretrial seizures (or prosecutions) that lack *probable cause*, and § 1983 grants qualified immunity to defendants who mistakenly but reasonably conclude that probable cause exists. As a matter of procedure, the Fourth Amendment prohibits

extended pretrial detentions unless a *neutral decisionmaker* finds that probable cause exists, and § 1983 grants absolute immunity to witnesses who testify before one such decisionmaker (the grand jury).

1. *Probable Cause.*   Reading the Fourth Amendment in light of our common-law traditions, the Supreme Court has held that it prohibits a defendant's pretrial detention unless the government has "probable cause to believe he committed a crime." *Manuel*, 137 S. Ct. at 920. Yet the Supreme Court has "often" reminded courts that probable cause is not a "high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction" beyond a reasonable doubt. *Adams v. Williams*, 407 U.S. 143, 149 (1972); *Illinois v. Gates*, 462 U.S. 213, 246 (1983). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation omitted).

This constitutional rule has significance for § 1983 plaintiffs. Those asserting a Fourth Amendment claim against a pretrial detention (or prosecution) must show, at a minimum, that the defendant lacked probable cause. *Manuel*, 137 S. Ct. at 919–20; *Sykes*, 625 F.3d at 308–09. And apart from that constitutional floor, § 1983 adds other statutory requirements. If a defendant relies on the defense of qualified immunity, the plaintiff must show that a defendant's probable-cause finding violated clearly established law. *Wesby*, 138 S. Ct. at 589. In this fact-dependent context, that test will generally require the plaintiff to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* at 590 (citation omitted).

2. *Neutral Decisionmaker.*   Again interpreting the Fourth Amendment in light of our common-law traditions, the Supreme Court has next held that an extended pretrial detention requires a neutral decisionmaker to make the probable-cause finding. *County of Riverside v. McLaughlin*, 500 U.S. 44, 53–58 (1991). If officers have arrested an individual without a warrant, they generally must take the individual before a magistrate within 48 hours. *Id.* at 56. If, by contrast, a grand jury has indicted the individual, the Fourth Amendment allows the "grand jury's judgment" of probable cause to "substitute for that of a neutral and detached magistrate[.]"

*Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975); *United States v. Williams*, 504 U.S. 36, 51 (1992). As the Court has said, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Ex Parte United States*, 287 U.S. 241, 250 (1932); *see Kaley*, 571 U.S. at 328.

This constitutional rule has significance for § 1983 plaintiffs too. The judiciary's respect for the grand jury has led courts to hold that the grand jury's finding creates a presumption of probable cause in later proceedings under § 1983. *See King v. Harwood*, 852 F.3d 568, 586 (6th Cir. 2017); *Cook v. McPherson*, 273 F. App'x 421, 423–24 (6th Cir. 2008); *Higgason v. Stephens*, 288 F.3d 868, 876–77 (6th Cir. 2002). Courts have not, however, been clear on the *source* of this probable-cause presumption. It might be described as an interpretation of the Fourth Amendment itself (e.g., that "seizures" during criminal cases generally cannot be deemed "unreasonable" if a grand jury has found probable cause). *Cf. Durham v. Horner*, 690 F.3d 183, 189 n.7 (4th Cir. 2012). Or, like qualified immunity, it might be described as an interpretation of § 1983 (e.g., that this statute adopts generic common-law rules, which might include the presumption). *Cf. Manuel*, 137 S. Ct. at 920; *see Conder v. Morrison*, 121 S.W.2d 930, 931 (Ky. 1938) (Kentucky law).

Either way, we have also explained how plaintiffs may overcome this probable-cause presumption. We traditionally held that plaintiffs could defeat the presumption by proving that the defendant knowingly or recklessly made false statements to the grand jury. *See King*, 852 F.3d at 586–87. But the Supreme Court upended that test by holding that witnesses who testify before the grand jury are entitled to absolute immunity, an immunity that covers false statements. *Rehberg v. Paulk*, 566 U.S. 356, 367–70 (2012). Since *Rehberg*, we have clarified that a plaintiff may overcome the presumption if the defendant fabricates evidence or knowingly or recklessly makes materially false statements outside the grand-jury context. *See King*, 852 F.3d at 587–88.

B

Lester's claim faces two immediate obstacles under this mix of Fourth Amendment and § 1983 rules. For one thing, a grand jury indicted Lester and triggered the "presumption of probable cause[.]" *Id.* at 586. Lester attempts to overcome this presumption by arguing that Detective Roberts recklessly failed to disclose to the prosecutors and the grand jury problems with Jasmine Williams's statements. But this purported "omission" of exculpatory evidence (as opposed to affirmative "false statements," *King*, 852 F.3d at 857) may not suffice to defeat this presumption. The Constitution does not require prosecutors to present *any* exculpatory evidence to the grand jury. *Williams*, 504 U.S. at 51–52. Courts in this context thus have held that "failing to disclose potentially exculpatory evidence differs from affirmatively falsifying evidence." *Costino v. Anderson*, 786 F. App'x 344, 348 (3d Cir. 2019); *Burgess v. DeJoseph*, 725 F. App'x 36, 39–40 (2d Cir. 2018); *cf. Martin v. Maurer*, 581 F. App'x 509, 511 (6th Cir. 2014).

For another, because Detective Roberts receives absolute immunity for his grand-jury testimony, Lester must identify falsehoods that Roberts made outside the grand jury. *King*, 852 F.3d at 587–88. Lester attempts to do so by identifying omissions in Roberts's grand-jury *application*, not just his *testimony*. But absolute immunity covers a grand-jury witness's "preparatory activity" too. *Rehberg*, 566 U.S. at 370. Roberts's application looks a lot like that preparatory activity. That said, Lester also argues that Roberts did not properly assert this defense in his answer in this case. And we have noted that "absolute immunity must be affirmatively pleaded, or it is forfeited." *Parnell v. City of Detroit*, 786 F. App'x 43, 47 n.3 (6th Cir. 2019).

Given the complexities involved with these two preliminary issues, we opt not to decide this appeal using any probable-cause presumption or absolute-immunity defense. Lester's claim fails for a more basic reason. As we have said, the presence of probable cause for a prosecution or pretrial detention dooms any Fourth Amendment claim. *Manuel*, 137 S. Ct. at 919–20; *Sykes*, 625 F.3d at 308–09. Detective Roberts also has asserted a qualified-immunity defense. So Lester needed to identify cases with similar fact patterns in which courts found an absence of probable cause. *Wesby*, 138 S. Ct. at 590. Yet Lester has not made out a "constitutional

violation at all," let alone shown a violation of clearly established legal rules. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As a matter of law, ample evidence pointed to Lester as Baker's accomplice and created the required "substantial chance of criminal activity" to establish probable cause. *Wesby*, 138 S. Ct. at 586 (citation omitted).

Most notably, Jasmine Williams's account implicated Lester. She told Roberts that she had gone with Baker and his friend "Desean" to Hudson's apartment complex, that the two men went to Hudson's apartment, and that they ran out with money and marijuana. That night, Williams added, Baker confessed to shooting and killing Hudson. Williams also identified Lester from a photo array as the "Desean" that accompanied Baker to the murder and robbed Hudson.

Does Williams's statement suffice to establish probable cause on its own? "The Supreme Court has recognized that '[i]nformants' tips doubtless come in many shapes and sizes from many different types of persons,' ranging from the professional 'informant' to the 'honest citizen.'" *United States v. Baker*, 976 F.3d 636, 649 (6th Cir. 2020) (quoting *Gates*, 462 U.S. at 232–34). And we have recognized that a statement from a witness known to the police is "generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." *United States v. Hodge*, 714 F.3d 380, 385 (6th Cir. 2013); *see Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Yet we have added that a witness's uncorroborated statements might fall short if "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006) (quoting *Ahlers*, 188 F.3d at 370); *see Peet v. City of Detroit*, 502 F.3d 557, 564 (6th Cir. 2007).

We need not decide whether Williams's statement sufficed on its own because Detective Roberts had substantial corroborating evidence. Start with the big picture. Many witnesses supported Williams's general account. Confirming her claim that Baker was the murderer, Nikkia Sullivan told Roberts that Baker confessed to her too. Susan Copass-Cheng likewise told Roberts that Baker made incriminating remarks, including: "If they catch me, I'm gonna go away for a long time." Confirming Williams's claim that Baker and Lester had gone to the victim's

apartment, two eyewitnesses (Kristie Hart and Teresa Wise) saw two young African-American men in the apartment minutes before the murder. Hart identified Baker as one of the men. Confirming Williams's claim that the men ran back, another eyewitness (Charles Evans) saw two men running from the complex minutes later.

Turn to specifics. Detective Roberts corroborated details that Williams provided. She stated, for example, that Baker told her that he had shot the victim in the back of the head—precisely how Roberts knew the victim had died. Williams, who did not live in Louisville, also recalled that they parked at a BP near the apartment complex. Roberts knew that a BP was, in fact, across the street. And one eyewitness (Evans) had seen the two men run toward that BP.

Williams's identification of Lester also had specific corroboration. When conversing about the crime, Copass-Cheng noted that Williams had told her: "We haven't seen Dezuan since all that stuff happened" and "He's scared to death." Copass-Cheng told Roberts that she thought Williams was referring to *Lester*, explaining that she knew Lester from high school and that Lester was friends with Baker. Williams also told Detective Roberts that she had met "Desean" a few times at her apartment because she "had a computer that him and [Baker] would rap on." And Lester told Roberts that he was friends with Baker and that the two would "do[] music together[.]" To top it off, DNA on a hat at the scene was consistent with a mixture from Lester (and Baker).

All told, Williams's statements were sufficiently corroborated "to justify a reasonable officer's belief" in the credibility of her account implicating Lester. *See Peet*, 502 F.3d at 564.

C

In response, Lester cites our caselaw holding that an "officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence" when deciding whether probable cause exists for an arrest. *Gardenshire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). And he highlights inconsistencies between Jasmine Williams's statement and other evidence. But the alleged inconsistencies, even considered collectively, do not show the absence of probable cause.

As a general matter, Lester's fine-tooth combing over every detail seems more suited for arguments to the jury about why the government did not prove its case beyond a reasonable doubt than arguments to us about why probable cause did not exist for the government to bring that case. As the Supreme Court has recognized, the burden to establish the probable cause necessary to initiate a suit (and a pretrial detention) is much lower than the burden necessary to obtain a conviction. *See Adams*, 407 U.S. at 149; *Zantello v. Shelby Township*, 277 F. App'x 570, 572 (6th Cir. 2008). For this reason, the grand jury need not even be presented with exculpatory evidence. "As Blackstone described the prevailing practice in 18th-century England, the grand jury was 'only to hear evidence on behalf of the prosecution[,] for the finding of an indictment is only in the nature of an enquiry or accusation, which is afterwards to be tried and determined.'" *Williams*, 504 U.S. at 51 (quoting 4 William Blackstone, *Commentaries on the Laws of England* *300).

As a specific matter, the inconsistencies that allegedly plague Jasmine Williams's testimony fall well short of eliminating probable cause. We describe only Lester's primary claims here. *First*, Lester notes that Williams identified Baker's accomplice as "Desean," a pronunciation different from the way Lester pronounces his first name. Yet Roberts could find it unsurprising that Williams might mispronounce Lester's name. She had met him only a few times and was recalling events from years ago. Critically, despite the mispronunciation, Roberts obtained corroborating evidence that Williams was actually talking about Lester. Williams picked his picture from a photo array. In addition, Copass-Cheng, who knew Lester, believed that Williams had been referring to him when talking about Baker's accomplice. She also confirmed that Baker and Lester were friends, and Lester himself readily admitted to this friendship.

*Second*, Lester identifies alleged inconsistencies between Williams's statements and the physical evidence. Williams told Roberts that both men wore hats as they ran back to the car and that marijuana fell from them when they ran. But the police uncovered no marijuana from the street and one man left a hat in the victim's apartment. Here again, Williams gave this statement five years later, so Roberts could find it unsurprising that she did not accurately recall every detail. And other evidence corroborated her statements that the men returned with marijuana and

money. Kristie Hart, who knew the victim well, told Roberts that he regularly sold marijuana from his apartment and had some $3,000 in his pocket on the night of the murder. Hart further noted that both men were at least wearing hats when they entered his apartment. The victim's body was also found with his pockets turned inside out, suggesting that they had been rummaged through. The men also could have simply picked back up the marijuana as they ran. More generally, Williams's statement described what appeared to be a chaotic race to the car. She noted how "shit was falling" when they were running because they appeared to have items stuffed in their pockets, but "[t]heir pants were all baggy and they were holding their pants; and they didn't have no shirt on." (The men were presumably using their shirts as their bandanas.) This recollection of the scene generally matched what another eyewitness (Evans) had said: that at least one man lacked a shirt and that the other had to "keep stopping while he was running because he lost his shoe."

*Third*, Lester identifies inconsistencies between Williams's statements and statements from other eyewitnesses. Most notably, Evans thought that one of the men was William "Ray Ray" Charter, and Theresa Wise (who saw the men in the apartment) also suggested that one resembled Charter. Yet just because the police have more than one potential suspect does not mean that they lack probable cause for all of the suspects. *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 371–72 (2003). And "there is a meaningful distinction between *disregarding* potentially exculpatory information and *disbelieving* it." *Mahnke v. Garrigan*, 428 F. App'x 630, 635 (7th Cir. 2011) (order). Detective Roberts did not simply disregard the claim that Charter had been at the scene. He interviewed Charter, found him "forthcoming," and did not think he was involved. Detective Roberts also had overwhelming evidence against Baker, and Lester identifies nothing connecting Baker to *Charter*. But plenty of evidence connects Baker to *Lester*.

*Fourth*, Lester identifies discrepancies between what Nikkia Sullivan said Jasmine Williams told her months after the murder and what Williams told Roberts years later. Sullivan indicated that Williams was unable to tell Sullivan the name of Baker's accomplice, whereas Williams told Roberts that "Desean" was the accomplice. Likewise, Sullivan said Williams had been driving the car, whereas Williams told Roberts that she was in the backseat. Neither

discrepancy changes things. Roberts had other evidence to corroborate Williams's statement that Lester was the second man, including Copass-Cheng's statement that Williams had, in fact, identified Lester near the time of the murder. And whether Williams was the driver or a passenger does not undermine her identification of Lester. True, Williams had a motive to lie about driving—to avoid potential complicity charges—and that motive might undermine an officer's reliance on her story alone. *See Harness*, 453 F.3d at 754. But, as we have noted, Roberts corroborated her statements with substantial evidence. Lester also identifies no reason why any motive to lie would extend to Williams's identification of him as the accomplice. *Cf. United States v. Cooper*, 1 F. App'x 399, 404 (6th Cir. 2001). Aside from these discrepancies, moreover, Williams's separate statements to Sullivan and Roberts largely matched each other despite being years apart.

*Fifth*, Lester argues that Detective Roberts should have done more to corroborate Williams's identification before bringing his case back to the prosecutor. Lester notes, for example, that Roberts could have shown Lester's picture to other eyewitnesses (such as Hart or Wise) or run a background check on Williams to discover her criminal record. Perhaps as a matter of good detective work Roberts should have done these things. But "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371.

* * *

Combining the alleged discrepancies, Lester ends by arguing that he has at least created an issue of fact for the jury on this probable-cause question. Yet he does not identify any disputed "historical facts" about what Roberts knew. Instead, he says a jury could find a lack of probable cause based on this evidence. We recently clarified, however, that "the ultimate question of probable cause . . . in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020). Here, the historical facts are not in dispute and they point to a clear legal conclusion: probable cause existed.

III

That leaves Lester's malicious-prosecution claim under Kentucky tort law. "Malicious prosecution is an ancient and well-established common law cause of action with a long history in Kentucky jurisprudence." *Martin v. O'Daniel*, 507 S.W.3d 1, 7 (Ky. 2016). Today, it requires a plaintiff to prove, among other elements, the "*lack of probable cause*" for the underlying proceeding that the plaintiff complains about. *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *see Martin*, 507 S.W.3d at 11. Thus, a Kentucky claim for malicious prosecution, like a Fourth Amendment claim for an unreasonable seizure, cannot survive when the police had probable cause. *Fox*, 489 F.3d at 238. Kentucky caselaw likewise treats the question whether probable cause existed as a legal issue for the court. *See Craycroft v. Pippin*, 245 S.W.3d 804, 806 (Ky. Ct. App. 2008) (quoting *F.S. Marshall Co. v. Brashear*, 37 S.W.2d 15, 17 (Ky. 1931)). Lester, moreover, makes no claim that Kentucky courts follow a higher probable-cause standard under Kentucky law than our probable-cause standard under the Fourth Amendment. We thus may reject his tort claim for all the same reasons we have discussed: Probable cause existed for Lester's prosecution.

We affirm.