NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0095n.06

No. 22-1081

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 21, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| DENNIS TOMASIK, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| HEATHER MARTIN, | ) | MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | OPINION |

Before: BOGGS, STRANCH, and THAPAR, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** In 2017, a jury acquitted Dennis Tomasik of criminal sexual conduct with a minor that allegedly occurred from 1996 through 1998. A previous jury had convicted him of the same offense in 2007, but the Michigan Supreme Court vacated the conviction. Mr. Tomasik sued the detective, Heather Martin, who investigated his case in 2006, for malicious prosecution and *Brady* violations pursuant to 42 U.S.C. § 1983. The district court granted summary judgment to Martin. Because we find that probable cause existed at the time of Mr. Tomasik's arrest, we **AFFIRM**.

## I. BACKGROUND

### A. Allegations and Investigation

On February 13, 2006, Detective Heather Martin of the Kent County Sheriff's Department (KCSD) was assigned to investigate allegations of child sexual assault. Theo Jensen, a fifteen-year-old high school student, accused his neighbor, Mr. Tomasik, of sexually assaulting him on numerous occasions approximately ten years prior, from 1996 to 1998. Theo alleged that the

repeated assaults took place at the Tomasik residence during playdates with Mr. Tomasik's son, Ethan.

Theo first aired the allegations against Mr. Tomasik in a counseling session with a licensed therapist on February 4, 2006. Theo stated that while he was playing with Ethan inside the Tomasik residence, Mr. Tomasik removed Ethan from the room and then forced Theo to perform oral sex and masturbate him. The counselor submitted a report to the KCSD's family services unit.

There had been previous reports referred to the family services unit concerning Theo. Three days prior to the initial allegations, Theo's school suspended him for larceny. After Theo admitted to a KCSD officer that he stole money to get a friend out of a "drug jamb [sic]," the officer sent the case to the family services unit of the KCSD for referral to juvenile court. As a member of the family services unit, Detective Martin had access to the unit's records, but she was not involved in that investigation and denies that she knew of the larceny until the eve of Mr. Tomasik's trial.

To start her investigation, Martin interviewed Theo's father, Ted Jensen. Mr. Jensen confirmed that Theo made the allegations against Mr. Tomasik to his therapist. He explained that Theo used to go over to the Tomasik residence during the relevant period and disclosed that Mr. Tomasik was the married father of two children who worked as a "machinist," a job that required "numerous" or "very minimal" hours depending on the time of year.

Martin next interviewed both of Theo's parents. Theo's mother, Sue Jensen, provided background on Theo's development. She noted that Theo "had a very difficult time growing up" and the family "has had numerous problems," but stated that since disclosing the allegations, Theo had "totally changed for the better." The parents also alerted Martin about their concern for

another boy, Jason, "that may be another victim." Martin did not speak to Jason or his family until after Mr. Tomasik had been arrested.

On February 15, 2006, Martin conducted what she labeled a "forensic interview" of Theo. She reported that "Theo was able to differentiate between the truth and a lie and told me he would be honest." Theo recalled that he visited the Tomasik residence "up to three times a week" over the two-year period and the sexual assaults "occurred almost every time." During the first assault, Theo alleged Mr. Tomasik removed him from the basement and brought him to Ethan's bedroom, where Mr. Tomasik forced him to perform oral sex. Theo described games the boys were playing and features of Ethan's bedroom. Theo explained that other assaults included masturbation and oral sex. At this interview, Theo disclosed for the first time that Mr. Tomasik forced him to have anal sex on two occasions, which caused him to "bleed from his butt when he wiped." He explained that he could never forget this period of his life—"it was like remembering the first time taking a drug." Martin's notes show that Theo also believed that this happened to Ethan and to another potential victim, Jason, who his parents had mentioned to Martin.

Martin reported Theo's statements to his parents. After hearing of Theo's disclosure of anal abuse, Ms. Jensen told Martin that she had taken Theo to the doctor for "anal bleeding" around that time. Martin requested Theo's medical records, which she received approximately a week later on February 21, 2006. The medical records corroborated that Ms. Jensen took Theo to Dr. Randall Clark on February 17, 1997, because she noticed "blood on the tissue after [Theo] wiped." After performing a rectal exam, Dr. Clark diagnosed Theo with an inferior anal fissure, possibly as a result of constipation. In later entries, Theo's medical records showed repeated diagnoses of "attention deficit disorder with oppositional defiant disorder" and depression. There were also

later entries showing that Theo had a learning disability, made "sexual comments" at school, and possessed a white powder for which his mother request a drug screening.

Martin then contacted Mr. Tomasik, telling him she "wanted to speak to him about an investigation." On February 23, 2006, Mr. Tomasik met with Martin at the KCSD. The interview started with Tomasik's employment and family, and he explained that his wife, Kim, had been a stay-at-home mom since their second child was born in 1993. Martin then brought up the Jensen family and Theo. Mr. Tomasik remembered that Theo used to come over to hang out "right outside" with Ethan and friends; later in the interview, Mr. Tomasik said Theo had "maybe" been in his house "once or twice," before stating, "I don't think he's ever been inside my house."

Mr. Tomasik denied ever assaulting Theo, and stated that Theo was "not mentally stable" and was probably in trouble for something because Theo always seemed to be in trouble and he had seen the police at the Jensen's house during odd hours. Martin responded, "There's no denying that," and stated that "[t]here have been issues with [Theo] in the past." Mr. Tomasik also explained that he worked into the night and said his coworkers could provide corroboration for his schedule.

Mr. Tomasik volunteered to submit to a polygraph exam and returned to KCSD the next day with his wife for the exam. The parties have different perspectives on what occurred after the exam. Mr. Tomasik contends that the examiner, Martin's lieutenant superior, said, "you may not have done this, but you may have done something"; whereas Martin testified in January 2021 that the examiner told her that Mr. Tomasik failed the polygraph exam. Prior to trial, Tomasik received a "polygraph report," signed and dated February 24, 2006, that indicated he "failed to tell the truth when answering the relevant questions." The relevant questions listed were, "Did you put your

penis in Theo's mouth?"; "Did you put your penis in Theo's anus?"; and "Did your penis ever touch Theo?" The report ultimately opined that there was "Deception Indicated."

A few days later, Martin visited the local high school to speak with Mr. Tomasik's son, Ethan. Ethan could not recall Theo ever being inside his house, explaining that he spent "most of his time outside and just recalled riding bikes with Theo in the past." More specifically, Ethan said he never played in his basement because it was unfinished and used "for storage purposes only."

On February 28, 2006, Martin signed a request to charge Mr. Tomasik with criminal sexual conduct. She submitted the request to charge along with a police report to the prosecuting authorities. The police report detailed her interviews with Theo's parents, Theo, Mr. Tomasik, and Ethan, mentioned Theo's anal fissure in 1997, and referred the reader to the polygraph exam report. On March 3, 2006, Martin swore out a three-sentence probable cause affidavit that mentioned Theo's allegations of oral sex and anal sex and the 1997 record of an anal fissure; the same day, a felony complaint issued against Mr. Tomasik.

### B. Judicial Proceedings

After his arrest, Mr. Tomasik proceeded to a preliminary hearing in Kent County District Court on March 31, 2006. Martin did not attend. Theo was the only witness called and he testified that Mr. Tomasik had anal sex with him, but this time Theo claimed that it occurred "at least" 10 to 20 times. He estimated that Mr. Tomasik had oral sex with him 50 to 60 times. Theo testified that the assaults caused anal bleeding, which necessitated the doctor's visit documented in his medical records.

Mr. Tomasik's attorney cross-examined Theo. The cross-examination covered topics that included: Theo's prescriptions for antidepressants and Ritalin; the number of doctors and

therapists Theo had seen over the years; Theo's grandfather's death during the relevant period; Theo's anal bleeding and whether it could have been caused by constipation; Theo's disclosure of the assaults to a school counselor. Additionally, defense counsel questioned Theo about his interest in Batman because Theo carried around a Batman doll with him as an accessory, including when he testified at the hearings in Mr. Tomasik's case.

The district judge found that there was probable cause to "bind [Mr. Tomasik] over for trial" at the circuit court. Specifically, the district judge held that it was "satisfied that two crimes . . . were in fact committed, both being criminal sexual conduct in the first degree, and that probably, Mr. Tomasik . . . committed them."

In December 2006, the state circuit court remanded the case back to the state district court for another preliminary examination. On February 14, 2007, a second preliminary hearing was held before the same district judge. This time, Dr. Randall Clark, Theo's doctor, was the only witness. On direct examination by Mr. Tomasik's attorney, Dr. Clark testified consistently with the medical record from February 17, 1997: Theo came in for a visit after his mother observed blood on his toilet paper; Clark conducted an exam; and he diagnosed an anal fissure "secondary to constipation." On cross-examination, the prosecutor asked Dr. Clark if his diagnosis might "have been altered had a history of sexual abuse been provided to [him] at that time," and he responded, "Absolutely." The state district judge again found probable cause "based on the previous testimony" to bind Mr. Tomasik over to the circuit court on charges of criminal sexual conduct.

Tomasik's trial was set for April 17, 2007. On March 23, 2007, the circuit court issued an order compelling discovery of several items, including the audio recording of Martin's interview of Mr. Tomasik, his polygraph exam results, various counseling documents related to Theo's

allegations, Theo's medical records, and photos and measurements of the interior of the Tomasik

residence. During the four-day trial in April 2007, Martin interview of Mr. Tomasik was played

to the jury, which ultimately convicted him on two counts of criminal sexual conduct. The state

circuit court sentenced Mr. Tomasik to 12 to 60 years in prison.

The case proceeded through the appellate courts. In 2011, the Michigan Supreme Court

ordered the production of some of Theo's school and counseling records. These records

documented on several occasions that Theo was impulsive, regularly lied, and "distort[ed] reality."

In 2015, the Michigan Supreme Court vacated the conviction, finding that the trial court

abused its discretion by admitting the recording of Martin's interview of Mr. Tomasik. *People v.

Tomasik*, 872 N.W.2d 488 (Mich. 2015). The court found that Mr. Tomasik's substantial rights

were affected and the error "seriously affected the fairness, integrity or public reputation of judicial

proceedings." *Id.* More specifically, the court wrote:

> In a trial in which the evidence essentially presents a 'one-on-one' credibility
> contest between the complainant and the defendant, the prosecutor cannot
> improperly introduce statements from the investigating detective that vouch for the
> veracity of the complainant and indicate that the detective believes the defendant
> to be guilty.

*Id.* Mr. Tomasik was retried in February 2017. The charges went to the jury; the jury acquitted

Mr. Tomasik in less than thirty minutes. [1]

After his release, Mr. Tomasik sued Detective Martin in federal district court pursuant to

42 U.S.C. § 1983. He brought claims for malicious prosecution and *Brady* violations. Both parties

moved for summary judgment, and the district court granted Martin's motion on both claims. Mr.

---

[1] On appeal, Martin moves for this panel to take judicial notice of the second trial court's denial of Tomasik's motion for directed verdict after the prosecution rested its case. Because that fact has no effect on our analysis, we **DENY** the motion as moot.

Tomasik appeals the district court's grant of summary judgment to Martin on the malicious prosecution claim.

## II. ANALYSIS

We review a district court's grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the nonmoving party. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Pertinent to this case, we have clarified that "the ultimate question of probable cause . . . in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020). The parties agree that the historical facts are undisputed.

We have recognized a constitutional claim to be free from malicious prosecution under the Fourth Amendment. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citation omitted). A malicious prosecution claim requires a plaintiff to show the following: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Id.* Only the second element, whether Martin had probable cause to arrest Tomasik, is at issue in this case.

Probable cause "'requires only a probability or substantial chance of criminal activity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). A fluid concept, probable cause is based on the totality of the circumstances as

viewed by an objectively reasonable officer. *See id.* "Probable cause . . . is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

An officer's probable cause determination must be based on "reasonably reliable information that the suspect committed a crime" and must consider both inculpatory and exculpatory evidence. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Officers "cannot simply turn a blind eye toward potentially exculpatory evidence known to them." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). But "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Id.* at 371.

In determining whether probable cause existed, we look at the objective facts that were known to Martin at the time of the arrest. *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998). The record reveals that the following inculpatory facts were known to Martin: (1) the allegations Theo relayed to his counselor and Martin; (2) corroboration that Theo played at the Tomasik residence during the relevant period; (3) Theo's experiencing an anal fissure and anal bleeding in 1997 as explained by his mother and recorded in his medical chart; and (4) the inculpatory polygraph exam results communicated to Martin by the examiner and corroborated by his report. On the other hand, the following facts known to Martin tended to exculpate Tomasik: (1) inconsistencies in Theo's recounting of the assaults; (2) Mr. Tomasik's and his son Ethan's denials that Theo had been inside their house and Ethan's contradictory description of their house; (3) Mr. Tomasik's and Ethan's denials that the assaults occurred; (4) Theo's past "issues"

identified by Martin in her interview of Mr. Tomasik; and (5) evidence in Theo's medical chart showing later mental health diagnoses that might adversely affect his credibility.[2]

We begin with Theo's allegations. Eyewitness statements "are generally entitled to a presumption of reliability and veracity" and "will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Ahlers*, 188 F.3d at 370 (quoting *Rainer v. Lis*, 16 F.3d 1221 (6th Cir. 1994) (unpublished table decision)). Theo persisted in his allegations against Tomasik from his initial disclosure to his counselor in 2006 through the second trial in 2017. *See Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) ("[I]nasmuch as [the alleged victim] persisted in her accusations that Johnson twice assaulted her to the extent of testifying under oath in trial, the alleged inconsistencies cannot reasonably be deemed to compel the conclusion that probable cause had ceased to exist."). Theo's allegations of one-on-one sexual abuse were uncorroborated, but there was corroboration that he spent time at the Tomasik residence during the relevant period. *See United States v. Harness*, 453 F.3d 752, 754-55 (6th Cir. 2006) (finding that sexual battery allegation was bolstered by corroboration that confirmed there was a "window of time within which the alleged sexual assault could have occurred" (citation omitted)). The inconsistencies between Theo's account to his counselor and to Martin were not so significant as to defeat probable cause. *See Johnson*, 790 F.3d at 655 ("[T]he alleged inconsistencies cannot reasonably be deemed to compel the conclusion that probable cause had ceased to exist."). Martin was ostensibly aware of Theo's later mental health diagnoses and his drug use, which were relevant to his credibility as

---

[2] Martin testified that she believed she only received Theo's medical record detailing the anal fissure; however, a reasonable inference from the record is that she received more records.

a witness. *Boggs v. Collins*, 226 F.3d 728, 742 (6th Cir. 2000). The state district court judge, however, twice found probable cause based on Theo's testimony *alone*.

Regardless, whether Theo's allegations alone established probable cause is not dispositive in this case because Martin had other corroboration: that Theo spent time at the Tomasik residence during the relevant period; the medical record that Theo had an anal fissure in 1997; and the polygraph results indicating that Mr. Tomasik failed to tell the truth. The 1997 medical record showing that Theo had anal bleeding and an anal fissure is significant evidence supporting Theo's allegations that he was anally assaulted on two occasions.[3] *See Saltmarshall v. Prime Healthcare Servs.-Garden City LLC*, 831 F. App'x 764, 769 (6th Cir. 2020) (supporting probable cause finding with medical records). Finally, Martin was told by the examiner that Mr. Tomasik failed his polygraph exam—a fact supported by the report the examiner completed on the day of administration. Negative polygraph results, while not sufficient by themselves, can support a finding of probable cause. *Halsey v. Pfeiffer*, 750 F.3d 273, 301 (3d Cir. 2014); s*ee Cervantes v. Jones*, 188 F.3d 805, 813 n.9 (7th Cir.1999) (collecting cases) ("[P]olygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest existed under the Fourth Amendment."). Based on the totality of the circumstances in the record, Martin had probable cause to seek Mr. Tomasik's arrest.

This conclusion is bolstered by several state court findings during the pendency of the criminal case. Mr. Tomasik was arrested pursuant to a warrant procured based on a probable cause affidavit, which he admitted did not contain falsities. Absent deliberate or reckless disregard for

---

[3] Mr. Tomasik argues that the medical record is exculpatory because, at the time, Dr. Clark believed the bleeding could have been caused by constipation. This argument is unpersuasive because, as Dr. Clark testified at the second preliminary hearing, suspicion of sexual abuse would have "absolutely" colored his analysis as to the cause of the anal fissure.

the truth, "investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). And as noted, a state district court judge twice found that there was sufficient probable cause to believe that Mr. Tomasik had committed the crimes charged. *See Smith v. Walters*, 849 F. App'x 551, 556 (6th Cir. 2021) (noting state court finding as support for probable cause). Our precedent shows that a state court's probable cause finding in the underlying criminal case may bar a plaintiff from relitigating the probable cause issue in a later civil suit. *See, e.g., Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007). *But see Davis v. Gallagher*, 951 F.3d 743, 749 (6th Cir. 2020) (finding plaintiff was not collaterally estopped because he was ultimately acquitted); *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (finding vacated conviction also vacates preliminary court finding of voluntary confession).[4]

Mr. Tomasik primarily relies on *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), to argue lack of probable cause. There we held that a seven-year-old child's uncorroborated allegations of sexual assault did not establish probable cause. The probable cause determination in *Wesley* hinged entirely on the allegations of the child, whose credibility was in question. *See id.* at 430-33. We found that the child's "allegations against Wesley were facially implausible," noting the allegations included "at least one fantastical element—namely, his claim that his family members were present during one of the sodomy episodes." *Id.* at 431, 436. The child also alleged that Wesley sodomized him in his open and unlocked office within another person's line of sight in a crowded school setting. *Id.* at 436. In sum, *Wesley* is inapposite because there the allegations

---

[4] Because review of the record shows that Martin had probable cause to arrest Mr. Tomasik, we need not address whether Michigan preclusion law collaterally estops Tomasik from litigating the issue based on the state court's probable cause findings at the preliminary hearings. We also need not address whether Martin is entitled to qualified immunity.

were uncorroborated and lacked other inculpatory evidence. The allegations in this case do not suffer from the same facial implausibility and the record contains other corroborating and inculpatory evidence. In addition, we recently noted a distinction between the testimony of "very young children," as in *Wesley*, and "adolescents," finding that a fourteen-year-old girl's age "did not render her testimony incompetent to establish probable cause." *Alexander v. Harrison*, No. 21-1828, 2022 WL 13983651, at *6 (6th Cir. Oct. 24, 2022). And, as explained above, fifteen-year-old Theo's allegations were not the lone evidence that established probable cause.

Mr. Tomasik responds with some concerning arguments regarding the state criminal proceedings that resulted in his incarceration for nine years prior to his second trial and acquittal. To note a few: Mr. Tomasik's alibi that he worked long hours at his factory job; the evolving inconsistencies in Theo's allegations over the course of the case; Theo's mental health diagnosis affecting his credibility; an apparent failure to produce important discovery in a timely fashion; and the admission at his first trial of highly prejudicial testimony—the entire tape of Martin's initial accusatory interview, which ultimately led to the vacation of his first conviction. In general, however, these objections were better suited "for arguments to the jury about why the government did not prove its case beyond a reasonable doubt than arguments to us about why probable cause did not exist for the government to bring [the] case." *Lester v. Roberts*, 986 F.3d 599, 610 (6th Cir. 2021).

Mr. Tomasik also takes issue with several investigatory steps that Martin failed to take prior to arresting him—specifically, that she did not interview other possible victims, schoolteachers and administrators, Tomasik's wife, or Tomasik's coworkers. He insists that had Martin taken these additional investigatory steps, probable cause would have diminished or evaporated. "Perhaps as a matter of good detective work [Martin] should have done these things.

-13-

But '[o]nce probable cause is established, an officer is under no duty to investigate further . . . .'" *Id.* at 612 (quoting *Ahlers*, 188 F.3d at 371) (alteration in *Lester*). Despite Tomasik's protestations in his interview that Theo was mentally unstable and in trouble, Martin was not under an "obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require [her] to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988); *see also Lester*, 986 F.3d at 611 (noting the distinction between disregarding exculpatory information and disbelieving it). Finally, we cannot impute knowledge to Martin of "evidence that emerged after the arrest," such as Theo's counseling and school records or his larceny. *Peet*, 502 F.3d at 564. What matters is what Martin knew at the time. *Id.* at 564-65. Looking only at those facts, as explained above, we conclude there was probable cause to arrest Mr. Tomasik.

### III. CONCLUSION

Because the record reveals that Martin had probable cause at the time she sought Mr. Tomasik's arrest, we **AFFIRM** the district court's grant of summary judgment to Martin.