NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0490n.06

Case No. 13-1705

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 07, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BRIAN ASHBOURNE, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before:  BATCHELDER, Chief Judge; SILER and DONALD, Circuit Judges.

**ALICE M. BATCHELDER, Chief Judge.**   Criminal defendant Brian Ashbourne appeals two aspects of his judgment of conviction: the district court's denial of his motion to suppress evidence and its failure to give a particular, unrequested jury instruction.   We affirm.

**I.**

In November 2011, a known, reliable confidential-informant reported to the Detroit police that he had purchased marijuana from a man named "Shawn" (later established to be defendant Ashbourne) and could purchase more; that, while in the apartment, he had observed about 70 pounds of marijuana and some firearms; and that the apartment was "the last one on the right" in the Brooklyn Loft Apartments.   When the police, working with UPS, identified a suspicious package addressed to "Christopher Johnson/Johnson's Renovations" at the Brooklyn Loft Apartments, specifically "Apartment 129," they obtained a warrant to open the package and discovered 12.8 kg of marijuana inside.   They resealed the package for a controlled delivery.

The police obtained an anticipatory search warrant for Apartment 129 and prepared a raid

team to support two undercover officers posing as UPS employees for the controlled delivery. When the undercover officers arrived at the apartment building, Ashbourne greeted them in the entranceway, asked if they had a package for Chris Johnson, and after admitting that he was not Johnson, offered to take the package to Johnson. The officers declined, explaining that they were to take the package to the written address, so Ashbourne directed them to the end of the hallway, specifically to a rear exit door leading into the dark outside the building. The two apartments at the end of that hallway had identifying numbers, 127 on the left and 128 on the right. There was no apartment labeled 129, nor was the exit door identified as number 129. Meanwhile, a second man had joined them in the hallway and Ashbourne continued to ask for the package.

The arrival of the second man, coupled with the confined setting and Ashbourne's persistence, rattled the officers a bit, prompting one to slip away to inform the raid team and the other to finally give the package to Ashbourne. Ashbourne left through the exit door (i.e., the door he had identified as Apartment 129) with the package before the raid team arrived. The raid team pursued both men and quickly detained the second man, who claimed he was visiting a friend in the "last apartment down the hall." The raid team eventually captured Ashbourne reentering the building and recovered the package intact, with the marijuana, from a vacant room nearby.

Meanwhile, acting on the second man's story that he was visiting a friend in an apartment at the end of the hall, police first knocked on the door of Apartment 127 but the occupant denied knowing the man. Police then knocked on the Apartment 128 door (the last apartment on the right), and hearing noises within, announced themselves as police. When a woman opened the door, the police immediately recognized a "very powerful" smell of unburned marijuana. The woman said that she and Uncle Jerome were just visiting the apartment and that Uncle Jerome was

inside. Police continued to hear loud banging noises from within the apartment and called for Uncle Jerome to come to the door. No one came to the door but the noises continued. The police then entered the apartment, without a warrant, and conducted a protective sweep. The police did not find any other people in the apartment, but they found an open window, a gun, and a large quantity of marijuana, all in plain view. The raid team secured the apartment from the outside while police obtained a warrant.

When the police later executed the warrant, they found four loaded guns, ammunition, almost 70 kg of marijuana, other drug paraphernalia, and evidence that Ashbourne resided in the apartment (e.g., a marriage license and other documents). Also, upon his capture, Ashbourne had given his address as Apartment 128 and had two rent receipts in his wallet for Apartment 128.

A federal grand jury indicted Ashbourne, a Jamaican citizen, on charges of being a non-resident illegal alien in possession of a firearm, possession with intent to distribute marijuana, and possession of a firearm in furtherance of drug trafficking. When Ashbourne moved to suppress the evidence recovered from the warrantless search of Apartment 128, the district court denied the motion based on exigent circumstances. The case proceeded to a jury trial during which the court instructed the jury using the Sixth Circuit model jury instructions. Ashbourne's counsel did not object or request any particular instruction. The jury convicted Ashbourne on all three counts and the court sentenced him to 111 months in prison. Ashbourne appeals.

## II.

Ashbourne contends that the district court erred by finding that the warrantless search was justified by exigent circumstances. When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo,

considering the evidence in the light most favorable to the government. *United States v. Hinojosa*, 606 F.3d 875, 880 (6th Cir. 2010) (citations and quotation marks omitted).

Generally, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). But there are exceptions, such as the exception for "exigent circumstances." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). The Sixth Circuit has identified four categories of exigent circumstances, including one for the imminent destruction of evidence, i.e., the "urgent need to prevent evidence from being lost or destroyed." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988). "This need may be particularly compelling where narcotics are involved, for narcotics can be easily and quickly destroyed while a search is progressing." *Id*. at 1511-12. But we have further explained that when an officer believes that he must enter a private residence without a warrant to prevent the immediate destruction of contraband, he must have: "(1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order." *Id*. at 1512.

Here, the police believed that the known, reliable confidential informant had identified this apartment (by description, "the last one on the right," though not by number) as the location of a drug dealer with a large volume (estimated 70 lbs) of marijuana; they had intercepted a 12-kg package of marijuana addressed to the non-existent Apartment 129 (for which they had already obtained an anticipatory warrant); they had unexpectedly interacted with two suspects in the hallway, one who claimed to have been visiting this apartment and another who had escaped apprehension by the raid team and could be calling someone inside the apartment; they encountered a "very powerful" smell of unburned marijuana when the woman opened the door to

the apartment; they learned from that woman that she and Uncle Jerome were visiting someone inside; they heard unexplained noises from inside the apartment before, during, and after the woman opened the door; they believed these noises indicated the destruction of evidence; and they shouted to Uncle Jerome, or whoever might be inside, to come to the door but got no response. Based on this evidence, the officers had a reasonable belief that drugs were in the apartment, that other people were in the apartment, and that those people were or would soon be aware the police were on their trail, so that the destruction of evidence would be in order. Consequently, the exigent circumstances exception applies here and justifies the warrantless entry for the sweep.

On appeal, Ashbourne insists that the officers lacked probable cause or exigent circumstances because they lacked evidence that the marijuana that they smelled through the open door was possessed *illegally*, inasmuch as the Michigan Medical Marijuana Act, M.C.L. §§ 333.26421-26430, allows certain people to possess up to 12 marijuana plants or 2.5 ounces of usable marijuana. The district court rejected this argument by finding that the police are not required to anticipate or investigate a defendant's possible defenses to apparent illegality. The government takes a similar approach, based on the Supremacy Clause, and also points out that our most analogous case refutes Ashbourne's theory as well, *see United States v. Duval*, 742 F.3d 246, 252 (6th Cir. 2014) (rejecting a similar argument in the context of a search warrant affidavit).

Even assuming, arguendo, that Ashbourne is correct and the mere smell of marijuana alone would not support probable cause or exigent circumstances, such a rule would not change our conclusion here. Even if the officers had not smelled marijuana when the woman opened the door, the numerous other factors, taken in their totality, would demonstrate probable cause and justify the imminent-destruction-of-evidence exigent-circumstances exception here.

## III.

Ashbourne contends that the district court erred by failing to instruct the jury that it must be unanimous in its finding as to which particular firearm it found that he had possessed. Ashbourne concedes that his attorney did not raise this issue at trial and we therefore review for plain error. *See United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005). And we have previously considered and rejected a virtually identical argument on analogous facts:

> The fact-specific rule is that no unanimity instruction is required where multiple firearms charged in a single count were discovered as part of the same transaction. As [Defendant] Cook points out, *DeJohn* acknowledged an exception established in *Sims* for cases where a genuine risk exists that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts. But such a case is not present here.

*United States v. Cook*, 290 F. App'x 874, 883-84 (6th Cir. 2008) (citations, quotation marks, and editorial marks omitted) (relying on *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004), and *United States v. Sims*, 975 F.2d 1225, 1240-41 (6th Cir. 1992)).

Here, the district court instructed the jury using the 2011 version of the Sixth Circuit Pattern Criminal Jury Instructions, specifically Sections 12.01 and 12.03. Police discovered all four guns during the same search, stemming from the same incident and arrest. There was no risk that this would confuse the jury or that different jurors would convict for different criminal acts.

## IV.

Based on the foregoing, we AFFIRM the judgment of the district court.