RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MATTHEW HOWELL; ALISHA BROWN,

        *Plaintiffs-Appellants*,

    *v.*

JUSTIN MCCORMICK; JAMES JENSEN; JOSHUA VAUGHN;
WALLIS MASSEY; LUIS LOPEZ ALDEA; DANIEL POLK;
LIELA AVILA; METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY, TENNESSEE,

        *Defendants-Appellees*.

> No. 24-5570

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:15-cv-01428—William Lynn Campbell, Jr., District Judge.

Argued:  March 18, 2025

Decided and Filed:  August 25, 2025

Before:  THAPAR, BUSH, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Drew Justice, JUSTICE LAW OFFICE, Murfreesboro, Tennessee, for Appellants.
Melissa Roberge, METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON
COUNTY, Nashville, Tennessee, for Appellees McCormick, Jensen, Massey, Lopez Aldea,
Polk, and Metropolitan Government of Nashville and Davidson County, Tennessee.
**ON BRIEF:**  Drew Justice, JUSTICE LAW OFFICE, Murfreesboro, Tennessee, for Appellants.
Melissa Roberge, Michael R. Dohn, METROPOLITAN GOVERNMENT OF NASHVILLE &
DAVIDSON COUNTY, Nashville, Tennessee, for Appellees McCormick, Jensen, Massey,
Lopez Aldea, Polk, and Metropolitan Government of Nashville and Davidson County,
Tennessee.  John M. L. Brown, JOHN M. L. BROWN, PC, Whites Creek, Tennessee, for
Appellee Vaughn.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge. This case about feuding housemates raises a host of Fourth Amendment questions. A woman called 911 from outside her residence claiming that her housemate, Matthew Howell, had pointed a gun at her and refused to give her access to (what she said was) her car. In response, the Nashville police knocked on Howell's front door to speak with him. When Howell opened the door, the officers smelled an illegal drug. They entered Howell's home and arrested him for assaulting his housemate. They also temporarily handcuffed Howell's girlfriend, Alisha Brown, while they walked through the home.

Howell and Brown allege that the officers violated the Fourth Amendment by entering their home without a warrant, by arresting them without probable cause, by allowing the housemate to take the car, and by maliciously prosecuting Howell. They also allege that the officers' municipal employer had a policy or custom of condoning warrantless home entries. But the claims against the officers all fail either because the officers' conduct comported with the Fourth Amendment or because Howell and Brown have not shown that the officers violated clearly established law. And Howell and Brown lack adequate evidence to show an unconstitutional municipal policy or custom. We thus affirm the grant of summary judgment to the officers and municipality.

I

In 2014, Howell lived with his girlfriend, Brown, in a home outside Nashville, Tennessee. That October, Howell met Liela Avila, an aspiring musician, at a karaoke bar. Avila had recently moved to Nashville and needed a place to stay. Howell and Brown let Avila live with them for a modest rent. Avila stayed at Howell and Brown's home for a month or two. But Avila and Howell soon had a falling out over "an incident that happened with his dog." Avila Tr., R.254-6, PageID 1235. When Avila visited her parents in California for a few weeks around Thanksgiving, Howell texted her that she could not live at his home any longer.

Avila returned to Nashville on the evening of December 8.  When Avila visited her parents, she had left some of her things at Howell and Brown's home.  She also claims that she had parked her Chevy Lumina there.  Yet a dispute of fact exists over who owned this car.  Avila asserts that she bought the car from Howell's friend and possessed a title to it in her name.  At the same time, Howell claims that he bought the Lumina from the friend and owned the car.

Either way, Avila traveled to Howell and Brown's home to pick up her things after getting back into the city around 8:00 p.m.  Avila and Howell have different recollections of what happened next.  According to Avila, she took a taxi to the home by herself.  When she got there, Howell was drunk, unstable, and still upset with her.  She packed up most of her possessions in the Lumina.  After gathering a few final items from her upstairs bedroom, she spotted Howell at the bottom of the staircase.  He "walk[ed] up the stairs towards" Avila while "pointing [a] gun at" her and yelling at her to get out in a profanity-laden tirade.  Avila Tr., R.254-6, PageID 1236.  She "ran out of the house" and left the Lumina parked in the garage with her things.  *Id.*, PageID 1237.

According to Howell and Brown, Howell was not intoxicated.  Rather, "Avila was the one who was high as a kite that night[.]"  Howell Decl., R.277–2, PageID 1585.  The couple also claims that Avila brought a "male accomplice" into their home.  *Id.*  Believing that Avila had already moved out, Brown found it strange that Avila felt free to walk right in with this friend and go "upstairs, to where she had been staying."  Brown Tr., R.277-8, PageID 1774.  Howell and Brown repeatedly asked Avila and her friend to leave, but Avila "insisted on staying" for several hours.  *Id.*  Howell asserts that he later forced Avila's friend out when this man "put hands on" Howell.  *State v. Howell*, 2018 WL 385505, at *4 (Tenn. Crim. App. Jan. 11, 2018).  Yet Howell disputes pointing a gun at (or otherwise threatening) Avila.  She left on her own a short time later.

Whatever took place inside the home, an audio recording leaves no doubt what happened next: Avila called 911 around 1:00 a.m. on December 9.  She told the dispatcher that Howell, her "crazy" and "drunk" housemate, had "her" car in their "garage" and was "refusing to let her have it."  911 Call, at 0:54–1:05, 1:29–:30.  She alleged that he had "pointed a gun at [her] face," although she did not "think it was loaded."  *Id.* at 1:06–:09.  After he did so, Avila also

explained, she "ran outside of the house" and called 911 from there. *Id.* at 1:12–:16. Avila opined that she was "safe" standing in the street some five houses down. *Id.* at 03:21–30. She later added that she did not think Howell would shoot at the officers but reiterated that he did have a gun. *Id.* at 1:36–:41. Avila further noted that another female in the home (Brown) was sleeping in the bedroom. She answered "no" when asked if she thought this woman was in danger. Throughout the call, Avila repeatedly returned to her main concern: getting her car from the garage. As she put it, she just wanted "to get [her] car" and "get the heck out of here." *Id.* at 4:06–:13. Avila stayed on the line until the police arrived.

A dispatcher relayed Avila's allegations to the responding officers. The dispatcher explained that an intoxicated Howell had pointed a gun at Avila, that Avila did not know if the gun was loaded, that Avila was now standing in the street, and that another woman was sleeping in the bedroom. This information triggered a "Code 3" response reserved for emergencies that may involve a risk to life.

Six police officers—Justin McCormick, James Jensen, Joshua Vaughn, Wallis Massey, Luis Lopez Aldea, and Daniel Polk—made their way to the scene. An "unnerved and shaking" Avila reiterated to some of these officers that Howell "was intoxicated and acting very crazy," that he had screamed at her about "owing money or rent," and that he had pointed a "small black handgun" at her. McCormick Decl., R.254–1, PageID 1190.

McCormick and two others approached the front door of Howell and Brown's home. Howell opened the door with Brown by his side. The parties disagree over Howell's demeanor. McCormick claims that Howell had "watery and glassy eyes," was "agitated," "spoke loudly," and "kept saying . . . that [Avila had been] in here but he had not laid a hand on her." McCormick Decl., R.254–1, PageID 1191. Howell and Brown counter that Howell had "acted reasonably calm," was not "aggressive," and only "asserted his constitutional rights." Howell Decl., R.277-2, PageID 1585; Brown Decl., R.277-1, PageID 1582.

Although the parties dispute Howell's behavior, they agree that the officers could smell the "aroma" of marijuana from the house. Undisputed Facts, R.276, PageID 1549. They also agree on what was said. Howell admitted that he had guns in the house but added that he did not

have one on his person.  Because Howell could have been hiding a gun "in his clothing," McCormick repeatedly asked him to step onto the porch so that the officers could frisk him.  *Id.*, PageID 1551.  Howell refused, but he did lift his shirt to show that he did not have a gun under his waistline.  Howell also told Brown not to step outside.  And he handed the officers his lawyer's business card.

At this point, Officers McCormick, Aldea, and Vaughn entered the home to handcuff and frisk Howell.  The officers suggest that Howell resisted their efforts, so they had to push him against a wall to get the necessary leverage.  They then arrested Howell for aggravated assault and resisting a frisk.  Howell responds that he did not "physically resist a 'frisk'" and that McCormick suddenly "twisted [him] around in a martial-arts style maneuver" while the others "piled on top of" him.  Howell Decl., R.277-2, PageID 1585.  He claims that they "slamm[ed]" him into a wall with one arm held behind him, injuring his shoulder.  *Id.*

The officers took Howell to a patrol car, patted him down, and placed him inside.  Officer Polk interrogated Howell in the cruiser.  Howell told Polk where the officers could find his small black handgun that matched Avila's description.  He also ostensibly gave consent for them to enter the home to seize this weapon.  But Howell claims that he did so only because the officers threatened to harm Brown if he did not.

At some point, McCormick, Vaughn, and Polk returned to the front door to question Brown.  They tried to persuade her to admit that Howell had pulled a gun on Avila.  Brown refused, reiterating that Avila had barged into their home and refused to leave.  The officers allegedly decided that Brown was uncooperative and put her in handcuffs "right on the threshold" of the front door.  Brown Dep., R.254-3, PageID 1211.  She remained cuffed for about 30 to 45 minutes.

During this time, officers conducted a "protective sweep" of the home but saw no other occupants or any "narcotics related evidence in plain sight."  McCormick Decl., R.254-1, PageID 1196.  Officer Vaughn then searched for Howell's gun and found it in the spot that Howell had identified.  Other officers accompanied Avila into the home to gather her belongings.  They also allowed Avila to access the Chevy Lumina.  When she tried to drive the car out of the garage,

though, the engine would not start. Avila recalls asking the officers for help with pushing the car to the street so that she could call a tow company. But they responded that "it was out of their jurisdiction and they would not be able to help [her] push the car[.]" Avila Dep., R.254-4, PageID 1225. She thus allegedly had to push it herself. Howell recalls things differently. He claims that he "saw the police pushing [the] car out of the driveway for Ms. Avila" while he sat detained in the police cruiser. Howell Decl., R.277-2, PageID 1586. In any event, Brown remembers that the car remained on the premises even after the officers had left. Brown Dep., R.254-3, PageID 1217.

A Tennessee grand jury indicted Howell for committing an aggravated assault of Avila and resisting the officers' arrest. *See Howell*, 2018 WL 385505, at *1. Howell stood trial. *See id.* At the close of the evidence, the trial court instructed the jury that it could convict Howell of various lesser-included offenses to aggravated assault, including reckless aggravated assault and simple assault. *Id.* at *4. The jury found Howell guilty of reckless aggravated assault but acquitted him of aggravated assault and resisting arrest. *Id.* at *5. After the trial, however, the state court recognized that it should not have instructed the jury that reckless aggravated assault qualified as a lesser-included offense for aggravated assault. *Id.* The court "amended" the guilty verdict to simple assault and sentenced Howell to 30 days in jail. *Id.* An appellate court then reversed this conviction on double-jeopardy grounds because simple assault required an *intent* mindset that the jury had rejected by convicting Howell of *reckless* aggravated assault. *Id.* at *7–9.

While these criminal proceedings progressed, Howell and Brown filed this civil suit against (among others) the Metropolitan Government of Nashville and Davidson County ("Nashville") and the officers involved in the confrontation. Relying on 42 U.S.C. § 1983, the complaint alleged that the officers had violated the Fourth Amendment in several ways. The complaint also asserted tort claims under Tennessee law.

The district court granted summary judgment to Nashville and the officers. *See Howell v. McCormick*, 2024 WL 2278335, at *15 (M.D. Tenn. May 20, 2024). It rejected the federal constitutional claims on the merits. *See id.* at *4–14. And it declined to exercise supplemental jurisdiction over the state tort claims. *See id.* at *14. We must review the court's summary-

judgment decision de novo and resolve the many evidentiary disputes in the light most favorable to Howell and Brown. *See Pineda v. Hamilton County*, 977 F.3d 483, 489 (6th Cir. 2020).

II

On appeal, Howell and Brown renew their federal constitutional claims against the officers. And the officers renew their request for qualified immunity. So Howell and Brown must complete two steps to obtain their requested damages. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). At step one, Howell and Brown must show that the officers violated the Constitution. *See id.* On that front, they argue that one or more of the officers violated the Fourth Amendment in four ways: by entering their home without a warrant; by arresting them without probable cause; by seizing the Chevy Lumina; and by maliciously prosecuting Howell. At step two, Howell and Brown must show that the relevant judicial decisions "clearly established" these constitutional violations "at the time" of the encounter. *Id.* at 63 (citation omitted). Howell's and Brown's various claims all fail at either the first or second of these qualified-immunity steps.

### A. Warrantless Entry

Howell and Brown first argue that the officers violated the Fourth Amendment by entering their home without a warrant. The Fourth Amendment protects a person's "house[]" from "unreasonable searches[.]" U.S. Const. amend. IV. Because the home sits at the "core" of the Amendment's protections, *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation omitted), officers generally must obtain a warrant from a neutral magistrate before they may cross its threshold, *see Lange v. California*, 594 U.S. 295, 301 (2021). This requirement applies no matter the reason for the entry. Officers thus typically must obtain a warrant if they want to enter a home to arrest a suspect—even when they have probable cause to believe that the suspect committed a crime. *See Payton v. New York*, 445 U.S. 573, 576 (1980). And they typically must obtain a warrant if they want to enter a home to search for contraband—even when they have probable cause to believe that the home contains the contraband. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). In short, warrantless entries into a home presumptively violate the Fourth Amendment. *See id.*

But this rule comes with exceptions. The Fourth Amendment's text prohibits only "unreasonable searches and seizures," and not every warrantless entry into a home can be described as *unreasonable*. *See Caniglia v. Strom*, 593 U.S. 194, 197–98 (2021). Most commonly, officers need not obtain a warrant if "exigent circumstances" require them to enter the home immediately without taking the time necessary to track down a judicial officer. *Lange*, 594 U.S. at 301. Different factors can create these exigent circumstances. Perhaps the officers fear for the safety of individuals trapped in the home. *See Caniglia*, 593 U.S. at 198; *Brigham City*, 547 U.S. at 406. Or perhaps they fear for their own safety from a potentially dangerous suspect barricaded inside. *See Lange*, 594 U.S. at 301. Or maybe the officers fear that the homeowners will destroy evidence of a crime hidden there. *See Kentucky v. King*, 563 U.S. 452, 460 (2011).

What evidence suffices to create these exigencies? Like most questions under the Fourth Amendment, this exigent-circumstances question triggers a fact-specific test that evaluates whether an emergency existed from the perspective of a reasonable officer. *See id.* at 464. So the officers' subjective reasons for entering the home do not affect the validity of the entry. *See Brigham City*, 547 U.S. at 404; *cf. Whren v. United States*, 517 U.S. 806, 813 (1996). And when deciding whether an emergency existed, courts must objectively consider the totality of the circumstances from just before the entry. *See Lange*, 594 U.S. at 301–02.

The government bears the burden to prove these exigent circumstances. *See Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010). When considering whether it has met this burden at the summary-judgment stage, we must resolve all evidentiary disputes about the historical facts in the light most favorable to the nonmovants (typically, the plaintiffs). *See Gambrel v. Knox County*, 25 F.4th 391, 404 (6th Cir. 2022). Once we determine these facts, we are left with the "ultimate" or "mixed" question: did the facts rise to the level required to create exigent circumstances? Our cases have long treated this question as one reserved for the jury in civil suits. *See Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989) (per curiam); *see also Reed v. Campbell County*, 80 F.4th 734, 743 (6th Cir. 2023); *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). But we have added that (as with any question of historical fact) we may resolve this question at the summary-judgment stage if a reasonable jury could give only

one answer.  *See Ewolski*, 287 F.3d at 501; *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992).

Here, the officers claim that they had exigent circumstances for two reasons: "the risk of danger to the police or others" and the risk of "imminent destruction of evidence" in the home. *Johnson*, 617 F.3d at 868 (citation omitted).  We need only consider their second reason.  That reason requires us to ask: when may police officers immediately enter a home out of concern that suspects inside might destroy evidence of a crime?  This question often arises in the drug context because suspects may easily dispose of the evidence down a drain when police officers knock on the door.  *See King*, 563 U.S. at 461; *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990).

Our precedent on the question has taken a fact-bound approach.  On the one hand, we have held that exigent circumstances exist if officers have a "reasonable belief" *both* that someone inside the house possesses contraband *and* that these parties might soon destroy the contraband to cover their tracks.  *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988).  Applying these factors, we have found exigent circumstances when officers knocked on a suspected drug trafficker's door, alerted him to their presence, and heard him make noises consistent with "destroying evidence."  *United States v. Renfro*, 620 F.2d 569, 575 (6th Cir. 1980); *see also United States v. Ashbourne*, 571 F. App'x 422, 424–25 (6th Cir. 2014); *United States v. Elkins*, 732 F.2d 1280, 1285 (6th Cir. 1984).  We have also held that officers could enter a suspected drug trafficker's home when they arrested his colleague, whose failure to return to the home could have tipped off the trafficker that something was awry.  *See Sangineto-Miranda*, 859 F.2d at 1512–13; *see also United States v. Elkins*, 300 F.3d 638, 655–57 (6th Cir. 2002).  And in a vacated opinion, we have held that exigent circumstances existed when officers knocked on a hotel room door and saw a marijuana blunt because there was "little doubt" that the suspect would dispose of the blunt before the officers could get a warrant.  *United States v. Carter*, 315 F.3d 651, 656 (6th Cir. 2003), *aff'd en banc on other grounds*, 378 F.3d 584 (6th Cir. 2004).

On the other hand, we have refused to find exigent circumstances when the officers did not have a reasonable belief of one or the other of our factors.  So we have held that the police did not have exigent circumstances to enter a house that contained drugs because they had no

reason to believe anyone was at home when they entered. *See United States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001); *see also Shamaeizadeh v. Cunigan*, 338 F.3d 535, 541, 549 (6th Cir. 2003). And we have held that the police did not have exigent circumstances to enter a home that contained drugs because they had no reason to believe that the suspects in the home had learned of the police "activity outside" and obtained an incentive to destroy the drugs. *See Radka*, 904 F.2d at 362–63.

The facts of this case sit somewhere in between the facts of these cases. Both sides agree that, after McCormick and two other officers knocked on the front door, they smelled the "aroma" of marijuana wafting out of the home. Undisputed Facts, R.276, PageID 1549. At that time (as today), Tennessee criminalized marijuana possession. *See* Tenn. Code Ann. §§ 39-17-415(a)(1), 39-17-418(a). So Howell and Brown do not dispute that the officers had probable cause to believe that the home contained illegal narcotics. *Cf. United States v. Sheckles*, 996 F.3d 330, 341 (6th Cir. 2021). As for the exigency of an immediate entry, the officers also reasonably believed that someone was inside the house because they spoke to Howell and Brown. *Sangineto-Miranda*, 859 F.2d at 1512. This case thus boils down to whether the officers could reasonably believe "that the loss or destruction of evidence [was] imminent" from the mere fact that they smelled marijuana and had alerted Howell and Brown to their presence. *Radka*, 904 F.2d at 362.

We need not answer this question. We will instead jump to the "easier" issue at step two of the qualified-immunity analysis: Did Howell and Brown prove that the officers violated their "clearly established" rights under the Fourth Amendment? *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015) (citation omitted). Even if exigent circumstances did not exist, the officers could still rely on their qualified-immunity defense. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999–1000 (6th Cir. 1994). To overcome that defense, Howell and Brown must show that any "reasonable officer" would have recognized the illegality of the entry. *Wesby*, 583 U.S. at 63 (citation omitted). In other words, the officers here must have been "plainly incompetent" or must have "knowingly violate[d] the law." *Id.* (citation omitted).

Howell and Brown cannot meet this "demanding standard" for two reasons. *Id.* For one thing, the parties do not identify any caselaw from our court answering this Fourth Amendment

question. *Cf. Carter*, 315 F.3d at 656.  And the lack of precedent about the "specific conduct" at issue generally dooms a plaintiff's effort to show that the conduct violated clearly established law. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam).  Plaintiffs instead must identify the legal rule that the officers violated with "a high 'degree of specificity'" to ensure that the officers had notice that their conduct exceeded constitutional bounds. *Wesby*, 583 U.S. at 63 (citation omitted).  The Court has especially stressed this requirement when considering Fourth Amendment questions that require officers to consider all the circumstances (such as whether they had probable cause or used excessive force). *See Rivas-Villegas*, 595 U.S. at 6; *Wesby*, 583 U.S. at 64.  Courts must likewise take a "case-by-case" approach to the exigent-circumstances question by evaluating all the facts. *Lange*, 594 U.S. at 302 (citation omitted).  So one could argue that the same need for specificity should apply in this exigent-circumstances setting too. *See Gradisher*, 794 F.3d at 584; *Aragon v. City of Albuquerque*, 423 F. App'x 790, 794 (10th Cir. 2011) (Gorsuch, J.); *see also Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987).

For another thing, several courts have found exigent circumstances on similar facts. *See Tolliver v. Sheets*, 594 F.3d 900, 916 n.6 (6th Cir. 2010).  In these courts, an officer's smell of marijuana—when combined with the residents' knowledge of the officer's presence—justifies entry into a residence. *See United States v. McMillion*, 472 F. App'x 138, 140–41 (3d Cir. 2012); *Hardy v. Broward Cnty. Sheriff's Office*, 238 F. App'x 435, 441–42 (11th Cir. 2007) (per curiam); *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir. 1991) (per curiam); *State v. Hughes*, 607 N.W.2d 621, 623–24 (Wis. 2000) (Sykes, J.).  Take *Grissett*.  There, a motel called the police about a man with a gun. 925 F.2d at 778.  Officers found this man without a photo ID. *Id.*  The man told them that an individual in a motel room could identify him. *Id.*  The police knocked on the door to this room and announced their presence. *Id.*  When someone opened the door, they smelled marijuana. *Id.*  The officers entered and found drugs. *Id.*  The Fourth Circuit held that exigent circumstances justified this entry. *Id.*  It reasoned that the officers could reasonably believe that the guests would have tried to destroy the evidence while the officers sought a warrant because the officers "had identified themselves before smelling the marijuana[.]" *Id.*  Here, then, we cannot describe the officers as "plainly incompetent" when these many other courts would have permitted their conduct. *Wesby*, 583 U.S. at 63 (citation omitted).  And while other courts have come out differently on this issue, the "fractured" nature

of the "case law" confirms that the legality of the officers' actions was subject to reasonable dispute. *White v. Stanley*, 745 F.3d 237, 241–42 (7th Cir. 2014); *see Stanton v. Sims*, 571 U.S. 3, 6–11 (2013) (per curiam) (citation omitted).

To be sure, a separate line of our cases has sometimes rejected a qualified-immunity defense based on the clearly established nature of the *general* rule that warrantless entries into a home without exigent circumstances violate the Fourth Amendment. *See Reed*, 80 F.4th at 745–46; *Williams v. Maurer*, 9 F.4th 416, 437–38 (6th Cir. 2021); *Barton v. Martin*, 949 F.3d 938, 949–50 (6th Cir. 2020). These cases start by finding that a reasonable jury could conclude that no exigent circumstances existed on the facts presented. *See Reed*, 80 F.4th at 746. They next reason that, if a jury could find that no exigent circumstances existed, the court must accept that purported fact (or, more accurately, that mixed question of law and fact) as true when deciding whether the officers' conduct violated clearly established law. *See id.* They then hold that every reasonable officer would know that a warrantless entry without exigent circumstances violated the Fourth Amendment. *See id.* That said, in another exigent-circumstances case, we held that this rule (that warrantless entries presumptively violate the Fourth Amendment) "frame[d] the issue at too high a level of generality." *Gradisher*, 794 F.3d at 584; *see also Anderson*, 483 U.S. at 640–41.

We need not reconcile our cases on this topic here. At the least, the chain of reasoning from these cases cannot apply where, as here, a well-established body of law from other courts would permit the conduct at issue. *See, e.g.*, *Grissett*, 925 F.2d at 778. Even if the jury ruled for Howell and Brown, this out-of-circuit precedent would continue to exist next to the jury's verdict. So it would continue to show that a "reasonable official"—indeed, a reasonable *court*— could have found that the officers did not violate the law (even if the jury thought otherwise). *Wesby*, 583 U.S. at 63 (citation omitted); *see Stanton*, 571 U.S. at 10–11; *White*, 745 F.3d at 241–42.

Howell and Brown's contrary arguments lack merit. They first suggest that the officers entered their home with the intent to arrest Howell rather than to search for drugs. But the officers testified that they engaged in a "protective sweep" of the home during which they did not spot "any narcotics related evidence in plain sight." McCormick Decl., R.254-1, PageID

1196; *see* Jensen Decl., R.254-2, PageID 1200.   Besides, this argument misunderstands the nature of the exigent-circumstances exception.   Under that exception, the officers' "subjective motivation" for their entry "is irrelevant."   *Brigham City*, 547 U.S. at 404.   As long as a reasonable officer could have concluded that a concern with the destruction of evidence created exigent circumstances, qualified immunity would protect the officers no matter their reasons for the entry.

Howell and Brown next highlight the Supreme Court's decision in *Johnson v. United States*, 333 U.S. 10 (1948).   There, the officers smelled illegal narcotics emanating from a hotel room.   *Id.* at 12.   Rather than get a warrant, they immediately knocked on the door and entered after a short conversation with one of the occupants.   *Id.*   They opted to approach the occupants immediately rather than get a warrant because of the "inconvenience" and "delay" involved in drafting up the necessary "papers" and offering them "to a magistrate."   *Id.* at 15.   The Court held that these bureaucratic reasons did not suffice to overcome the warrant requirement.   *Id.* Yet the officers here could have reasonably concluded that "*Johnson* is distinguishable" from this case.   *Hughes*, 607 N.W.2d at 628.   The officers in *Johnson* learned of the smell at a time when the individuals in the hotel room were "unaware of their presence" (and so those individuals had no incentive to destroy the drugs).   *Id.*   Here, by contrast, the officers did not learn of the drug smell until *after* they announced their presence and created the incentive to destroy the drugs.   *See id.*

Howell and Brown lastly turn to the Supreme Court's more recent opinion in *King* to argue that exigent circumstances cannot exist without evidence suggesting that people in the home are actively destroying drugs.   But *King* declined to opine on the existence of exigent circumstances.   563 U.S. at 470–71.   It instead overruled "the so-called 'police-created exigency' doctrine."   *Id.* at 461.   The many versions of this doctrine all flowed out of the premise that the police cannot manufacture the emergency that lets them enter a home without a warrant (say, by revealing themselves to the suspects).   *See id.* at 461–62.   The Court rejected this rule and held that the usual exigent-circumstances standards should apply whenever the police actions that led to the emergency did not themselves violate the Fourth Amendment.   *Id.* at 462.   And here, the officers' decision to announce their presence and knock on the door (the conduct that created the

emergency) was one that any "private citizen" could undertake. *Id.* at 469. So it did not violate the Fourth Amendment. *Id.* *King* thus offers Howell and Brown no assistance. And because the officers did not violate clearly established law, qualified immunity protects them.

### B. Warrantless Seizures

Howell and Brown next suggest that the officers committed an "unreasonable" "seizure[]" of "their persons" when the officers arrested Howell and restrained Brown. U.S. Const. amend. IV. Yet the officers had probable cause to arrest Howell, so he has failed to show a constitutional violation at step one of the qualified-immunity analysis. And caselaw at the relevant time did not show that the Fourth Amendment barred the officers from temporarily detaining Brown, so she has failed to establish a violation of clearly established law at step two.

### 1. Howell's Arrest

Howell claims that the officers violated the Fourth Amendment by arresting him. Yet officers may make warrantless arrests if they have probable cause to believe that a suspect committed a crime. *See United States v. Watson*, 423 U.S. 411, 414–24 (1976). And officers need not surmount a "high bar" to establish this probable cause. *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). They need to show only "a probability or substantial chance of criminal activity[.]" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)).

When does this probable cause exist based on an eyewitness's firsthand account that a suspect committed a crime? We have long held that this evidence alone generally can establish the probable cause required to arrest the suspect. *See Farris v. Oakland County*, 96 F.4th 956, 963 (6th Cir. 2024); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). To show otherwise, a suspect must point to evidence that would have led reasonable officers to believe that the eyewitness was lying or mistaken. *See Wesley v. Campbell*, 779 F.3d 421, 429–30 (6th Cir. 2015). And a suspect's mere denial generally will not suffice to satisfy this burden. *Fisher v. Jordan*, 91 F.4th 419, 425 (6th Cir. 2024). Rather, the officers can credit the eyewitness's account over the suspect's competing narrative. *See Farris*, 96 F.4th at 964. That rule makes

sense because probable cause does not require the same amount of evidence that the government must produce to get a conviction at trial. *See Fisher*, 91 F.4th at 425.

This caselaw shows that the officers had probable cause here. They arrested Howell for committing an aggravated assault of Avila (in violation of Tennessee Code Annotated § 39-13-102(a)(1)(A)) and for resisting their frisk (in violation of Tennessee Code Annotated § 39-16-602(a)). Unlike a malicious-prosecution claim, *see Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–64 (2024), a claim alleging an unconstitutional false arrest will fail as long as the officers had probable cause for *one* of these offenses, *see Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020); *see also Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 303–04 (3d Cir. 2024). We thus will address only the aggravated-assault charge. In particular, we must ask whether there was a "substantial chance" that Howell "intentionally or knowingly cause[d] [Avila] to reasonably fear imminent bodily injury" through the "display of a deadly weapon[.]" *Wesby*, 583 U.S. at 57 (citation omitted); Tenn. Code §§ 39-13-102(a)(1)(A)(iii), 39-13-101(a)(2).

This substantial chance existed. Recall that Avila had told the 911 dispatcher that Howell, while acting "crazy" and "drunk," had "pointed a gun at [her] face" in a threatening manner. 911 Call, at 0:54–1:08. When the officers reached the scene, they found Avila "unnerved and shaking." McCormick Decl., R.254-1, PageID 1190. She reiterated to them that an "intoxicated" Howell had "pointed a small handgun at her" while "screaming at her about owing money or rent" and "acting very crazy[.]" *Id.* These "eyewitness" allegations alone likely created probable cause to believe that Howell had committed an aggravated assault because nothing at the scene suggested that Avila had been lying or mistaken about the events. *Farris*, 96 F.4th at 964. The officers also corroborated aspects of Avila's account because Howell admitted that he owned guns and that Avila had been in the home. And while Howell denied pointing a gun at Avila, the officers did not need to "credit [his] account over" Avila's when deciding whether they had probable cause for the arrest. *Id.*; *see Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001).

Howell's responses lack merit. He first claims that the *arresting* officers lacked probable cause because they did not personally talk to Avila before arresting him. Under our caselaw,

though, one officer may reasonably rely on information obtained from other officers. *See Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1134 (6th Cir. 2015) (citing *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007)); *see also United States v. Baker*, 976 F.3d 636, 642–43 (6th Cir. 2020). And the record here leaves no doubt that *other* officers confirmed what Avila had told the 911 dispatcher by speaking to her at the scene. It also leaves no doubt that Officer McCormick (an arresting officer) "heard" this information. McCormick Decl., R.254-1, PageID 1190. So the arresting officers' failure to speak to Avila makes no difference.

Howell next compares his circumstances to those in *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005). But *Fisher* looks nothing like this case. There, an anonymous tipster called 911 about a potentially suicidal man who appeared to have his feet tied to train tracks in rural Ohio. *Id.* at 839–40. In reality, this "retired farmer" had set up on the tracks to "shoot groundhogs" for his neighbors. *Id.* at 839. When the officers arrived, the farmer did everything they told him to do. *Id.* at 840. But the officers arrested him anyway. *See id.* at 840, 845. We held that the facts the officers learned at the scene contradicted the anonymous tip and rebutted any basis to suspect that the farmer was suicidal. *Id.* at 843–45. The officers here, by contrast, learned information from Avila at the scene that confirmed (rather than rebutted) what she had told the 911 dispatcher.

Howell lastly argues that Avila failed to provide enough information to establish probable cause that Howell committed an aggravated assault. He notes, for example, that Avila suggested that she did not think that the firearm had been loaded. And he contends that the officers should have considered whether he had acted in self-defense. Howell's theories may have raised good defenses at trial to convince a jury that he did not commit this crime beyond a reasonable doubt. *See Lester v. Roberts*, 986 F.3d 599, 610 (6th Cir. 2021). But the theories fall short of showing that there was not even a "substantial chance" that Howell committed an aggravated assault—all that the officers needed for probable cause. *Wesby*, 583 U.S. at 57 (citation omitted).

## 2. Brown's Detention

Brown claims that the officers arrested her without probable cause when they kept her in handcuffs for 30 to 40 minutes. Because we find this claim debatable, we opt to resolve it at the second step of the qualified-immunity analysis.

Brown identifies no "body of relevant case law" that would have told the officers that this detention exceeded constitutional bounds. *Wesby*, 583 U.S. at 64 (citation omitted). To the contrary, officers may temporarily detain a suspect when they have reasonable suspicion that the suspect has committed a crime. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). And the officers here could have reasonably believed that they at least had reasonable suspicion of Brown's illegal marijuana possession given the smell emanating from her home. *Cf. Fisher*, 91 F.4th at 426–28.

Citing *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006), Brown responds that the officers' decision to handcuff her turned this "*Terry* stop" into a full-fledged arrest. But we have held that officers may use handcuffs during *Terry* stops when the circumstances warrant. *See, e.g.*, *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007); *United States v. Jacob*, 377 F.3d 573, 579–80 (6th Cir. 2004); *cf. Muehler v. Mena*, 544 U.S. 93, 98–100 (2005). And *Smoak* would not have clearly established that the handcuffing turned Brown's detention into an arrest. In that case, officers stopped a family on the side of a freeway because of a mistaken belief that they had committed a robbery, forced the family to get on the ground with guns drawn, handcuffed them, and ultimately shot their dog. 460 F.3d at 774–76. We held that this force turned the temporary detention into an unreasonable arrest. *Id.* at 781–82. Yet the officers in *Smoak* had no basis to believe that the family might have weapons, *see id.* at 781, while Avila had just told the officers that Howell had pointed a gun at her and Howell had admitted that he kept guns in the home. Brown thus has identified no precedent that "addresses facts like the ones at issue here." *Rivas-Villegas*, 595 U.S. at 6. That failure entitles the officers to qualified immunity.

## C. Car Seizure

Howell next argues (in all of a page and a half of the appellants' brief) that two officers committed an "unreasonable" "seizure[]" of one of his "effects" by helping Avila "steal" his

Chevy Lumina.  U.S. Const. amend. IV; Appellants' Br. 40.  At the outset, this claim implicates two factual disputes.  Dispute one: Who owned the car?  The criminal case shows that the car's "certificate of title" lists Avila as the owner.  *Howell*, 2018 WL 385505, at *1.  But the officers' counsel did not put this evidence into our record.  And Howell asserts in an affidavit that he owned the car.  At this summary-judgment stage, then, we must assume that the car belonged to Howell even if he might face an uphill battle persuading a jury of this fact.  *See Gambrel*, 25 F.4th at 404.  Dispute two: Did the officers help Avila push the car out of the garage?  The officers and Avila have testified that they refused to assist her.  But Howell claims that he saw unidentified officers pushing the car down the driveway.  So again, we must accept his account—regardless of whether he could convince a jury.  *See id.*  Putting these two facts together, then, we must assume that some officers helped Avila push the car out of the garage even though Howell owned it.  At the same time, it is undisputed that Avila told the officers she owned the car.

Did the officers violate the Fourth Amendment on these facts?  Because of the parties' cursory briefing, we opt to resolve this question by again jumping to the second step of the qualified-immunity analysis.  Howell has identified no "legal principle" that establishes beyond doubt that the officers committed an unreasonable seizure.  *Wesby*, 583 U.S. at 63.  Indeed, we see much uncertainty over the controlling legal standards.  Suppose a 911 caller claims that another person has stolen the caller's property and asks for police assistance in getting it back.  How should responding officers sort out this property dispute?  Must they simply do nothing (as the officers claim they did here)?  May they help the 911 caller retake the property if the caller presents enough proof confirming ownership?  Must they allow the other person to present competing evidence?  How does state property law affect the Fourth Amendment calculus?  *Cf.* Tenn. Code Ann. § 29-30-101.  The parties do not address these questions—let alone offer input on their answers.  Howell thus has fallen well short of showing that "every reasonable" state official should have known that the Fourth Amendment prohibited the officers from helping Avila.  *Wesby*, 583 U.S. at 63.  We likely could affirm on this basis alone.  *See Mosier v. Evans*, 90 F.4th 541, 548 (6th Cir. 2024).

In any event, our own research has uncovered little "relevant precedents" on these questions. *Elder v. Holloway*, 510 U.S. 510, 512, 516 (1994). Start with the Supreme Court's cases. In *Soldal v. Cook County*, 506 U.S. 56 (1992), the Court did clarify that state actors engage in a "seizure" when they interfere with an owner's possessory interests in property. *Id.* at 61–62. But all agreed that the plaintiffs in *Soldal* owned the property at issue: a trailer home. *See id.* at 57, 61–62. And all agreed that the police had violated state law by assisting a trailer-park owner in removing the home from the park. *See id.* at 58, 72. The Court also did not offer any guidance over when property seizures qualify as "unreasonable" under the Fourth Amendment. *See id.* at 71–72. So *Soldal* did not clearly establish anything useful for how the officers in this case should have handled the ownership dispute that they confronted. *See Wesby*, 583 U.S. at 64.

Turn to our precedent. In a case that Howell does not cite, we have held that officers can violate the Fourth Amendment by helping a private party take the plaintiff's personal property. *See Cochran v. Gilliam*, 656 F.3d 300, 307–09 (6th Cir. 2011). In *Cochran*, a tenant claimed that officers worked with a landlord to seize the tenant's property as a self-help remedy for the tenant's failure to pay rent, even though "there was no apparent legal basis for such action." *Id.* at 303–04, 309. Yet a reasonable officer could have distinguished *Cochran* from this case on two grounds. *See Wesby*, 583 U.S. at 64. The officers in *Cochran* knew that the property belonged to the tenant. *See* 656 F.3d at 303. Here, by contrast, Avila told the officers that the car belonged to her. And the officers in *Cochran* helped the landlord remove the property from the premises. *See id.* at 304, 308. Here, by contrast, the officers at most pushed the car out of the garage. Brown provided undisputed testimony that the car *remained* "on the premises" after the officers had left. Brown Dep., R.254-3, PageID 1217. So an unassisted Avila took the car only later.

Howell fares no better with his citation to *Collins v. Nagle*, 892 F.2d 489 (6th Cir. 1989). There, a truck owner's son used the truck to block the gate to an illegal mining operation while mining officials were on site investigating the operation. *Id.* at 491–92. After arresting the son, the officials called a tow truck to impound the truck. *Id.* at 492. The truck owner argued that this impoundment amounted to an unreasonable seizure because the officials could have simply

moved the truck a small amount to open the gate.  *See id.* at 493.  Applying a totality-of-the-circumstances test, we disagreed and found that the officials had behaved reasonably.  *Id.* at 493–94.  *Collins* thus does not clearly establish a violation in this case either.  *See Wesby*, 583 U.S. at 63.

In sum, no decision would have given the officers "fair notice" that their conduct violated the Fourth Amendment.  *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 926 (6th Cir. 2024) (citation omitted).  So qualified immunity protects them from liability for their alleged interference with Howell's possessory interests in the Lumina.  *See id.*

## D.  Malicious Prosecution

Howell next seeks to hold Officer McCormick liable for "malicious prosecution" under the Fourth Amendment.  *See Thompson v. Clark*, 596 U.S. 36, 42 (2022).  We find his argument difficult to evaluate because Howell does not identify the claim's basic elements—let alone the disputed ones.  Instead, he argues that McCormick's affidavit in support of an arrest warrant and his police report both contained knowingly false statements.  Which element(s) of a malicious-prosecution claim does this factual allegation implicate?  Neither Howell nor McCormick says.  Perhaps the "cursory" nature of the briefing on the claim would again suffice to allow us to affirm.  *Mosier*, 90 F.4th at 548.  Regardless, Howell's claim flunks a basic element of this claim.

Under controlling caselaw, a malicious-prosecution claim requires plaintiffs to prove four things.  They must connect the sued officer to the prosecution by showing that the officer "made, influenced or participated in" the prosecutorial decision.  *Lester*, 986 F.3d at 606 (citation omitted).  They must show a "lack of probable cause" for the challenged charge or charges in the indictment.  *Id.*; *cf. Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–64 (2024).  They must prove that the prosecution caused a "deprivation of liberty" (or "seizure" in the words of the Fourth Amendment) apart from the initial arrest.  *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (citation omitted); U.S. Const. amend. IV; *see also Chiaverini*, 602 U.S. at 562.  And they must show that the prosecution ended without a conviction.  *See Thompson*, 596 U.S. at 44, 49.

We opt to resolve this dispute based on the second element: the lack of probable cause. As we have said, officers need not surmount a "high bar" to show probable cause for a prosecution. *Lester*, 986 F.3d at 608 (citation omitted). They need only establish "a probability or substantial chance" that the suspect committed the charged crimes. *Id.* (quoting *Wesby*, 583 U.S. at 57). That said, this element comes with an added wrinkle here because a grand jury indicted Howell on two counts: aggravated assault and resisting arrest. The grand jury's decision to indict creates a presumption that probable cause supported these charges. *See Price v. Montgomery County*, 72 F.4th 711, 725 (6th Cir. 2023). And Howell can overcome this presumption only by showing, among other things, that McCormick made false statements that were "material" to the prosecution. *See id.*; *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017).

Howell has not overcome the presumption. Avila, an "eyewitness" to his alleged assault, testified at a preliminary hearing that Howell pointed a gun at her in a threatening manner. *Farris*, 96 F.4th at 964. This testimony alone likely provided probable cause to prosecute the aggravated-assault charge—as a state judge found when sending the case to a grand jury. *See id.* At the least, Howell offers no reasons why the testimony should fall short—and so he has forfeited any contrary claim. *See Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 601 (6th Cir. 2025).

In response, Howell seeks to overcome the probable-cause presumption by suggesting that McCormick falsely suggested in his warrant affidavit and police report that *he* (rather than *other officers*) interviewed Avila. Yet Avila's live testimony stood "independent" of anything that McCormick put in those documents. *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005). So these alleged false statements were not "material" to the aggravated-assault prosecution. *King*, 852 F.3d at 587–88. We need say no more to reject Howell's malicious-prosecution claim.

Admittedly, the Supreme Court has now clarified that courts must take a charge-by-charge approach to malicious prosecution (unlike false arrest). *See Chiaverini*, 602 U.S. at 562. That is, a plaintiff in multicount cases might still have a viable malicious-prosecution claim on one charge even if the plaintiff lacks a viable claim on another one. *See id.* And the grand jury

also indicted Howell for resisting arrest. Still, Howell has not explained why *Chiaverini*'s reasoning would help him. Indeed, the Court recognized that an invalid charge might still fall short if it did not *cause* a defendant's deprivation of liberty because, for example, the defendant would have remained in jail for the same amount of time based on the valid charge alone. *See id.* at 564–65. Howell makes no claim that he spent even a single hour in jail based solely on the resisting-arrest charge. Like *Chiaverini*, though, we can ultimately leave the proper causation test for another day. *See id.*

Why? Because a more basic qualified-immunity principle bars Howell from relying on *Chiaverini*. Before that 2024 decision, we had established the opposite legal rule: that probable cause on one charge categorically forecloses malicious-prosecution claims in multicount cases. *See id.* at 560–61. And the conduct in this case arose before *Chiaverini*. That case thus had not clearly established its new approach "at the time" of Howell's prosecution. *Lawler*, 93 F.4th at 927 (citation omitted). Our old approach—under which the probable cause on the aggravated-assault charge automatically doomed Howell's malicious-prosecution claim—would have barred Howell from relying on the resisting-arrest charge. In short, because probable cause supported "at least one of the charges," Howell cannot establish that McCormick infringed "clearly established law" and so "qualified immunity" protects him. *Rasawehr v. Grey*, 2025 WL 1639164, at *5 (6th Cir. June 10, 2025); *see also Rivera-Guadalupe*, 124 F.4th at 299–303.

## III

Howell and Brown lastly seek to hold Nashville liable for its officers' alleged constitutional violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978). But they cannot impose vicarious liability on Nashville for the illegal actions of its officers under § 1983. *See Coleman*, 130 F.4th at 599. Rather, they must prove that one of Nashville's "policies or customs" caused the Fourth Amendment violations. *Id.* at 599–600; *see Monell*, 436 U.S. at 694.

Plaintiffs can prove this type of unconstitutional policy or custom in different ways. *See Mosier*, 90 F.4th at 548. A city, for example, might have had an official policy that instructed officers to engage in conduct that violated the Fourth Amendment. *Cf. Tennessee v. Garner*, 471

U.S. 1, 4–6, 22 (1985).  Or the city might have followed an unofficial custom of tolerating this illegal conduct.  *Cf. Pineda*, 977 F.3d at 495.

Howell and Brown rely on both theories.  They allege that Nashville's policies condoned unlawful entries into people's homes and that, at the least, Nashville followed a custom of permitting these unlawful entries.  At the same time, they concede that their evidence showed only a "tenuous" connection between Nashville and the other constitutional violations that they allege.  Appellants' Br. 42.  So they have forfeited any other *Monell* claims.  *See Coleman*, 130 F.4th at 601.  And the two remaining theories fall short.

Start with Nashville's official policies.  Howell and Brown claim that two policies violate the Fourth Amendment.  They first note that Nashville's policy on domestic-abuse cases instructs its officers that the "preferred response" is to "arrest a person committing domestic abuse unless there is a clear and compelling reason not to arrest."  Policy, R.254-9, PageID 1335.  Because domestic abuse typically occurs in the home, Howell and Brown reason, this policy instructs officers to routinely enter homes to conduct arrests in violation of the Fourth Amendment.  Yet officers may enter homes in many legal ways, such as if they obtain the victim's consent, *see Fernandez v. California*, 571 U.S. 292, 298–300 (2014), or if they fear for the victim's safety, *see Brigham City*, 547 U.S. at 406.  And nothing in this recommendation tells officers to *illegally enter* someone's home to effect the domestic-abuse arrest.  To the contrary, the policy elsewhere tells officers that they generally may not enter homes to make "a routine felony arrest" under the Supreme Court's precedent.  Policy, R.254-9, PageID 1308 (citing *Payton*, 445 U.S. at 576).

Howell and Brown next note that Nashville's policy on warrantless searches and seizures identifies the specific "circumstances" in which officers may search a home (or seize an individual) without a warrant, but the policy adds that the authority to conduct these warrantless searches and seizures is "not limited to" the specific examples.  *Id.*, PageID 1296.  Howell and Brown read this "not limited to" disclaimer as giving Nashville officers free rein to enter any home or seize any person at will.  But we do not read the disclaimer in this absurdly broad manner.  Howell and Brown do not dispute that the specific examples all comport with the Fourth Amendment.  Basic interpretive rules thus tell us to read the suggestion that officers may

conduct other non-listed warrantless searches as reaching only those that also comply with that amendment. *Cf. Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024).

Turn to Nashville's informal customs. Howell and Brown claim that Nashville has condoned an abusive "knock-and-talk" practice in which officers approach people's homes late at night. Appellants' Br. 42. But this theory of liability required them to establish "a clear and persistent pattern" of Fourth Amendment violations. *Pineda*, 977 F.3d at 495 (citation omitted); *see Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Yet Howell and Brown identify only three vague examples—some of which do not appear to have involved unconstitutional conduct. These three conclusory examples would not allow a reasonable jury to find an unconstitutional custom. *See, e.g.*, *Burley v. Sumner Cnty. 18th Jud. Drug Task Force*, 2023 WL 9894461, at *3 (6th Cir. 2023); *Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007).

We affirm.